# Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| HENRY SCHEIN, INC.,<br>a Delaware corporation,<br><br>                              Plaintiff,<br><br>    v.<br><br>CRAIG HOLBROOK, HOLBROOK<br>ENTERPRISES, LLC d/b/a GLOBAL<br>MEDICAL & DENTAL, a Hawaii limited<br>liability company, and PATTERSON DENTAL<br>SUPPLY, INC., a Minnesota corporation,<br><br>                              Defendants. | 09 Civ. _____<br><br>**FILED**<br>IN CLERK'S OFFICE<br>U.S. DISTRICT COURT E.D.N.Y<br>★ JUN 29 2009 ★<br><br>**09 2769**<br>**COMPLAINT AND DEMAND FOR** ~~JURY~~ **SERVICE**<br>**JURY TRIAL**<br><br>**WEXLER, J.**<br>**TOMLINSON, M.J.** |

Plaintiff Henry Schein, Inc., by its attorneys Proskauer Rose LLP, for its Complaint

against Defendants Craig Holbrook, Holbrook Enterprises, LLC d/b/a Global Medical & Dental

("Global") and Patterson Dental Supply, Inc. ("Patterson Dental") respectfully alleges as follows:

## INTRODUCTION

1.       Henry Schein, Inc. ("Schein") is a distributor of dental, medical and veterinary

products, headquartered in Melville, NY.  For at least the last thirteen years, and until just last

week when Global abruptly purported to terminate it, Schein had a long-term exclusive sales

agent agreement with Global or its predecessor, under which Global sold dental products for

Schein in the State of Hawaii.  Global took over the long term exclusive sales agent agreement

from its predecessor in 2002.  Since 2002, Schein has paid Global over $7 million in sales

commissions for selling its products in Hawaii.  The 1996 Exclusive Sales Agent Agreement

between the parties, as twice amended in 2002 and 2005, by its terms, continues until December

31, 2015. (The 1996 Agreement is Exhibit A; the 2002 amendment is Exhibit B; and the 2005 amendment is Exhibit C to this Complaint.)

2.      Schein has been the dominant distributor of dental products to dentists in Hawaii for years. Schein's Hawaiian dental distribution business has in excess of $10 million in net sales per year, upon information and belief a much larger sum than any of Schein's competitors.

3.      Upon information and belief, earlier this year, Global's owner, Defendant Craig Holbrook, secretly decided to sell his business to one of Schein's major competitors, a large company called Patterson Dental, which until last week lacked a substantial presence in the State of Hawaii. The terms of the Exclusive Agency Agreement between Schein and Global represented an obstacle to such a sale, however. Among other things, it provides that, if Global voluntarily terminated the agreement, Global can not for a period of one year sell any products in competition with Schein. See Exhibit A, Paragraph 13 (a) (ii) on pages 9-10. This provision lends some measure of protection to the trade secrets and confidential and proprietary information belonging to Schein that Global acquired by taking over the business in 2002 and in the course of the parties' long working relationship. The Exclusive Sales Agent Agreement also prohibits Global from disclosing or using for its own benefit Schein's "Confidential Information," defined to include (among other things) the identity or lists of Schein's customers in Hawaii, their needs and requirements, and cost and pricing information. See Exhibit A, Paragraph 11, on page 8.

4.      Holbrook developed a subterfuge to try to evade these restrictions so that he could sell his business to Patterson Dental, which was eager to access to the dental distribution business that Schein had built in Hawaii. Holbrook asserted a series of supposed "material breaches" by Schein of the exclusive sales agent agreement; in essence he claimed that Schein

2

had failed to pay him all the commissions that were due under the parties' agreement. Even if Holbrook's claims had merit, these purported underpayments are only a relatively small fraction of the commissions Schein has paid to Holbrook over the years.

5.     On May 22, 2009, Holbrook sent a letter to Schein claiming that there were essentially four such material breaches. He asked Schein to cure these alleged breaches within thirty days. Holbrook said nothing in his letter about his intention to terminate the 1996 Exclusive Sales Agent Agreement or to sell what is essentially Schein's distribution business to its major competitor, Patterson. Global's May 22 letter is Exhibit D.

6.     On June 22, Schein, not realizing that Holbrook's May 22 letter was part of his plan to claim a right to terminate, responded to that letter, pointing out that most of the supposed breaches were nonexistent (either the products in question were not within the scope of the Exclusive Sales Agent Agreement, or the commissions earned by Global had in fact been paid), by wiring money to cover amounts it admitted were owed (Schein acknowledged that it owed Global approximately $34,000 on one particular group of products and wire transferred that amount to Global), by acknowledging that the parties had been in negotiations over the commission split for a new product that Schein had introduced last year and expressing its willingness to continue those discussions, and by offering to allow Global to audit its books and records. Schein also acknowledged that the parties had come to terms on a commission split for one other product under which Schein owed Global an additional $49,000, and offered to pay that amount as soon as Global acknowledged the understanding that the parties had reached. (Schein's June 22 letter is Exhibit E.)

7.     The "material" breaches that Global claimed were either nonexistent or were cured. In any event, even if every single one of Global's claims of alleged breach had merit (and

3

they do not) in the context of the parties' long and extensive relationship (Schein had already paid more than $1.2 million to Global in 2008, and has paid more than $7 million to Global since 2002), the total amount claimed would be a small fraction of the amounts Schein has paid to Global over the years and is therefore not "material." Indeed, Global has never before made an issue of many of these alleged "material" breaches in the course of the parties' seven-year relationship.

8.      That did not matter to Holbrook, however.  Within days of Schein's June 22 response, Holbrook sent a letter, dated June 25, 2009, on behalf of Global, purporting to terminate the Exclusive Sales Agent Agreement for alleged material breach relating to the amounts he claimed were due.  Unbeknownst to Schein, Holbrook did not actually want Schein to cure any alleged defaults; instead he simply wanted a pretext to terminate the Agreement, allegedly for cause.  Holbrook therefore refused to accept the $34,000 in unpaid commissions that Schein wired to him in conjunction with its June 22 letter.  (Holbrook's termination letter is Exhibit F.)

9.      The reason for Holbrook's actions soon became clear.  Over the weekend of June 27/28, Patterson Dental called Schein and announced that it had purchased Global.  Patterson Dental now had a full sales force in Hawaii that had been trained at Schein's expense.  That sales force had hundreds of customer relationships, and intimate knowledge of those customers' requirements, order history, pricing, upcoming needs and prior equipment purchases, among other things.

10.      By this action, Schein seeks to enforce the covenants in the Exclusive Sales Agent Agreement that prevent Global and its owner Holbrook from competing with Schein for a period of one year after the termination of the contract, and that prevent Global and Holbrook from

using, disclosing or selling Schein's "Confidential Information." Schein seeks an injunction to enforce those covenants against Global and its owner Holbrook. Schein also seeks a declaratory judgment that Global's purported termination of the Agreement due to its pretextual claims of breach is of no effect. Schein also seeks an injunction to prevent Patterson Dental from breaching the restrictive covenants in the Exclusive Sales Agent Agreement. In addition, Schein seeks ancillary remedies, including an award of attorneys' fees pursuant to the terms of the contract, as well as any actual damages that Schein is able to prove after discovery.

## PARTIES

11.     Plaintiff Schein is a Delaware corporation with its principal place of business at 135 Duryea Road, Melville, NY. Schein is a public company and the largest distributor of healthcare products and services to office-based practitioners in the combined North American and European markets. Schein's customers include dental practices and laboratories, physician practices, and animal health clinics, as well as government and other institutions. This action involves Schein's dental business.

12.     Defendant Holbrook Enterprises, LLC is a limited liability company formed under the laws of the State of Hawaii, with its principal place of business at 91-291 Kalaeloa Blvd., Unit C-1, Kapolei, Hawaii 96707. Holbrook Enterprises, LLC does business under the trade name Global Medical and Dental.

13.     From 1996 on, Global or its predecessors were an exclusive sales agent for Schein in the State of Hawaii, pursuant to the terms of the Exclusive Sales Agent Agreement with Schein, dated April 1, 1996 (the "1996 Agreement;" Exhibit A), as amended on May 1, 2002 (the "2002 Amendment," Exhibit B) and as amended on October 26, 2005 (the "2005 Amendment," Exhibit C) (collectively, the "Agreement").

5

14.     Upon information and belief, there are two members of Holbrook Enterprises, LLC: Defendant Craig Holbrook and Ken Holbrook.  Upon information and belief, Defendant Craig Holbrook is a resident of the State of Hawaii and Ken Holbrook is a resident of the State of California.

15.     Upon information and belief, Defendant Patterson Dental Supply, Inc. is a Minnesota corporation with its principal place of business at 1031 Mendota Heights Road, Mendota Heights, MN, 55120.

### JURISDICTION AND VENUE

16.     This Court has diversity of citizenship jurisdiction over this case pursuant to 28 U.S.C. §1332, because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the dispute is between citizens of different States.

17.     Under the 1996 Agreement, the parties have consented to personal jurisdiction and exclusive venue in this judicial district.  Paragraph 16(b) (misnumbered as 15(b)), page 10, of that 1996 Agreement states, in pertinent part:

> The parties irrevocably submit to the exclusive jurisdiction of either the New York State Supreme Court, Nassau County, or the United States District Court for the Eastern District of New York over any action, suit or proceeding arising out of or relating to this Agreement.  The parties irrevocably waive, to the fullest extent permitted by law, any objection which they may now or hereafter have to the laying of venue of any such action, suit or proceeding brought in such a court and any claim that any such action, suit or proceeding brought in such a court has been brought in an inconvenient forum.

Accordingly, venue is proper in this District pursuant to 28 U.S.C. § 1391.

## STATEMENT OF FACTS

### The Relevant Terms Of The Agreement

18.    On April 1, 1996, Schein entered into the 1996 Agreement (Exhibit A) with Mark F. Heilbron d/b/a M.F.H. Consultants, Inc. ("MFH").  In 2002, the 1996 Agreement was assigned to Global by MFH, as recited in the 2002 Amendment (Exhibit B).

19.    The Agreement provides that Global shall be the Exclusive Sales Agent for Schein in Hawaii with respect to the sales of certain dental products, as defined therein.  The products covered by the Agreement (the "Products") are "specifically limited to the products and services manufactured, produced and distributed by [Schein's] Dental Division, [its] Practice Management Technologies Division, and [Schein subsidiary] Zahn Dental Co., Inc."  (1996 Agreement, ¶1(a))  Global is prohibited, during the term of the Agreement, from "sell[ing], distribut[ing] or market[ing] any dental product, supply or service anywhere other than [the HSI Products]."  (1996 Agreement, ¶1(b))

20.    In the Agreement, Global acknowledged that it would receive trade secrets and proprietary and confidential information, and that this information would remain at all times the property of Schein.  The Agreement provides that:

> [Global], on his or its own behalf and on behalf of any and all of his or its employees, hereby agrees, at any time not to divulge, use, derive monetary or economic benefit from or make accessible to any person or business entity any of [Schein's] trade secrets and/or confidential or proprietary information including, but not limited to, the identity or lists of customers, customer's needs and requirements, business methods, operational procedures, cost and price information, organizational and/or other business or financial information, or any other information for or incidental to the manufacture, marketing, or promotion of Products or the business structure or related elements or areas of [Schein's] organization . . . (all such information or any part thereof, the "Confidential Information") without the prior written consent of [Schein] . . . .

> (1996 Agreement, ¶11).

7

21.     The Agreement also restricts Global from competing with Schein in certain circumstances during the term of the contract and after termination.  Paragraph 12(a) of the 1996 Agreement provides:

> Agent covenants and agrees that Agent will not, at any time during any term hereof, directly or indirectly, within the Territory or within any other geographical area or territory where the business of [Schein] is presently being conducted . . own, manage, operate or control, or participate in the ownership, management, operation or control of, or be connected with or have any interest in, as an employee, consultant, advisor, agent, owner, partner, co-venturer, principal, director, stockholder, lender or otherwise, any business or enterprise that is competitive with any significant part of the business conducted by [Schein] . . .

22.     The term of the Agreement, pursuant to ¶1(A) of the 2002 Amendment (Exhibit B), ends December 31, 2015.  The Agreement recognizes implicitly that Global may voluntarily terminate the Agreement.  In the event that Global does so, however, it subjects Global to a one year non-compete provision:

> If this Agreement terminates for any reason other than (i) the material breach thereof by Agent or (ii) at the request of Agent (in which circumstance the restrictive covenants set forth in sub-paragraph 12(a) above shall remain in effect for one year past such termination date), the restrictive covenants set forth in subparagraph 12(a) above shall then no longer be imposed upon Agent.

(1996 Agreement, ¶12(b), pages 8-9)

23.     Under paragraph 13 of the Agreement (pages 9-10), if Global elects to voluntarily terminate the Agreement for any reason, it is subject to the one-year noncompete provisions of paragraph 12(a) of the Agreement:

> Agent acknowledges that any failure to employ his or its best efforts in the performance of the provisions of this Agreement will result in significant injury to [Schein], which may not be compensable by the award of monetary damages.  As such, **and notwithstanding anything to the contrary contained within this Agreement**, Agent agrees that failure to utilize his or its best efforts to fulfill his or its obligations under this Agreement or **Agent's voluntary termination of this Agreement will result in the imposition of the restrictive covenant in sub**

8

> *paragraph 12 (a), above, for a period of not less than one year from the date of such failure to utilize his or its best efforts or such voluntary termination.*

(1996 Agreement, ¶13) (emphasis added).

24.     In recognition of the importance of the confidentiality provisions and restrictive covenants contained in the Agreement, paragraph 12(d) of the 1996 Agreement provides for an award of injunctive relief, and an acknowledgement that Schein will be irreparably harmed if those provisions of the Agreement are not enforced:

> Since [Schein] will be irreparably damaged if the provisions of either paragraph 11 or paragraph 12 are not specifically enforced, [Schein] shall be entitled to an injunction restraining any violation of such paragraphs (without any bond or other security being required), or any other appropriate decree of specific performance, without the necessity of showing any actual damage or that monetary damages would not provide an adequate remedy. Such remedies shall not be exclusive and shall be in addition to any other remedy, including, without limitation, the remedy of money damages, which [Schein] may have at law or equity as a result of any such violation.

25.     The Agreement further provides that "if legal action is necessary to enforce the terms of this Agreement, the prevailing party will be entitled to reasonable attorneys' fees, in addition to any other relief to which that party may be entitled." (1996 Agreement, ¶17 at page 11.)

26.     Finally, the Agreement provides that it will be governed by New York law. (1996 Agreement ¶16(a) at page 10.)

27.     The 2002 Amendment gave Global the right to terminate the Agreement upon the payment of a "Breakup Fee" equal to the commissions received by Global for the prior twelve months:

> [Global] shall pay to [Schein] an amount equal to the commissions received by [Global] for the prior twelve (12) months (the "Breakup Fee") if (i) Global elects to terminate the Agreement and compete with [Schein] in the dental market, other than for a breach by [Schein] (subject to any cure rights) and/or [Schein]

9

terminates the Agreement due to [Global's] decision to distribute competitive products from a different source than [Schein], subject to any cure rights. Upon payment of the Breakup Fee by [Global] to [Schein], the Agreement shall be terminated and neither party shall have any further obligations to the other.

(2002 Amendment (Exhibit B) at ¶1(c) on page 2.)

28.     Neither of Global's May 22 or June 25 letter purported to invoke its right to terminate under Section 1 (C) and Global has never tendered the Break-Up fee. By its terms, termination under paragraph 1(C) of the 2002 Amendment does not take effect until payment of the Breakup Fee.

**The Parties' Long-Term Relationship Under The Exclusive Sales Agent Agreement**

29.     Since Global took an assignment of the Agreement in 2002, Global has realized more than $7 million in commission revenues. In 2008 alone, Schein paid Global more than $1.2 million in commissions.

30.     Over the years, Global became fully integrated into Schein's operations. Schein trained Global's sales representatives. Schein's telephone numbers rang at Global's offices. Global's computers linked directly to Schein's. Global's business cards had a Schein logo.

31.     The parties agreed in the 2002 Amendment that Global could create its own equipment sales operation. Global could purchase equipment from Schein at cost plus 10%. Global would make its own profit on such sales, and would not receive any commissions for such products from Schein. (2002 Amendment ¶6 at page 3.) Global was also able to sell products that it did not purchase from Schein, on which Global would make its own profits. (2002 Amendment ¶6 at page 3.)

32.     In 2005, Global requested that Schein increase the commission percentage that Global would receive on sales covered by the commission provision of the Agreement from

31.71% to 40%.  Schein agreed.  (2005 Amendment (Exhibit C) at Section 2A .)  Schein also

agreed to provide assistance, if feasible, to enable Global to purchase equipment directly from

manufacturers, and thus bypass the commission arrangements in the Agreement.  (*Id.* Section 6.)

33.     Schein's business underwent a dramatic change between 1996, when the

Agreement was first signed, and 2009.  During that period of time, Schein became a full-service

distributor of dental supplies and equipment.  Schein was offering relatively little equipment for

sale when the Agreement began in 1996.  By 2009, Schein had expanded its offerings to include

sophisticated dental equipment and technology for which Schein had exclusive distribution

rights.

34.     In order to sell such highly complicated equipment and software, Schein hired and

trained a staff of specialized sales representatives whose primary job was to sell a particular line

of products.  Those sales representatives were entitled to their own commissions, and payments

to Schein for the sales of such products varied considerably from the way that Schein was

compensated for sales of dental supplies, for example.  These specialized products included the

Dentrix line of software, which Schein began selling in 1998, the Dexis line of high-tech

equipment, introduced by Schein in 2005, and the E4D scanner, introduced in 2008.

35.     In recognition of the different requirements and mode of sale for such specialized

products, for certain of those products Schein and Global had agreed to vary the standard 40% of

"gross profit" commission.  On the Dentrix and Dexis line of products, Schein paid Global the

same commission that Schein's Field Service Consultants receive.  The parties had not yet come

to terms on the commission arrangement for the E4D prior to Global's abrupt, purported

termination of the Agreement.

**Holbrook Decides To Sell Global**

36.   In 2008, Holbrook expressed interest in selling Global to Schein.  Holbrook and

an advisor met with Schein representatives in 2008 and early 2009 to discuss such a sale.

Holbrook provided Schein with a sale book for the purpose of conducting those negotiations,

which contained financial figures relevant to the value of Global and included certain of Schein's

Confidential Information.

37.   Schein and Global had not come to terms by the time of Holbrook's purported

termination.  Schein informed Holbrook and his advisor that the sale book they had provided to

Schein contained Confidential Information that was confidential and proprietary and that they

could not show such information to third parties.

38.   Upon information and belief, Holbrook decided to shop his company Global to

other purchasers.  Upon information and belief, within the past week, Schein's competitor,

Patterson Dental, has purchased Global and/or all or substantially all of its assets.  Neither

Holbrook nor anyone else on behalf of Global ever informed Schein that Holbrook was

discussing a sale of Global to Patterson Dental.

**Holbrook Raises Claims Of Breach By Schein As A Pretext For Termination**

39.   In an effort to evade both the restrictive covenants and the Break-Up fee under the

Agreement, Global sought to elevate certain negotiating points that had arisen between the

parties over the course of their long relationship, and some points that the parties had never even

discussed, to the status of "material breaches."  Global sent a letter dated May 22, 2009, in which

it made essentially four claims that Schein had materially breached the Agreement.  (A copy of

the letter is Exhibit D.  Schein's response, dated June 22, 2009, is Exhibit E.)

12

40.     Global's first claim was that it is owed commissions on certain Schein equipment sales in Hawaii, principally the E4D machine, as to which the parties had not yet agreed on a commission structure in light of the unique way in which Schein sold that equipment. Schein had proposed to Global that commissions for the sales of the E4D should not be calculated the same way as the sales of products under the Agreement, because of the specialized sales force, account managers, and installers and field service personnel that share in the profits realized from those sales. Schein proposed to treat sales of those machines the same way it treated other products for which Schein has a specialized sales force. The parties had not yet concluded those discussions when Global decided to claim in its notice of default that it was owed a full 40% of the gross profit on those machines.

41.     Global also complained that it had not received royalties from sales by Nephron Dental. Nephron Dental was a separate company, owned by Schein but operating its own brand name, that did not sell Schein products. In any event, the company was dissolved in 2005 and has made no sales since that time.

42.     Global's third complaint related to commissions on the Dentrix software. Schein had been selling that software since 1998, without paying any commissions either to Global or to its predecessor. Nevertheless, Schein had proposed to Global that the parties could treat sales of this product as they had other products for which Schein has a specialty sales force. Schein agreed to tender approximately $49,000 to Global, provided that Global simply acknowledge the terms for the commissions on this product that both parties plainly had understood was not within the scope of the Agreement from the very inception of the Agreement.

43.     Global fourth complaint related to commissions that Global claimed it is owed on service calls made by Pro Repair.  In fact, as Schein has advised Global, all commissions due for Pro Repair products have been paid by Schein.  (Exhibit E at 3.)

44.     In short, Schein demonstrated to Global that the "material breaches" claimed by Global were not breaches of the Agreement, were cured, or even assuming they were not breaches, were not "material" breaches in the context of the parties' overall dealings. Nevertheless, Global immediately responded on June 25 that the Agreement was terminated due to these contrived breaches.  Two days later, Schein learned that Patterson Dental claimed to have purchased the company.  As a result of the breaches by Holbrook and Global of their obligations under the Agreement, one of Schein's major competitors claims to be able to serve the Hawaii market, using the Confidential Information belonging to Schein.

## COUNT ONE, AGAINST GLOBAL

### (Declaratory Judgment That Schein Did Not Materially Breach the Agreement and, Accordingly, Global Did Not Have the Right to Terminate the Agreement on That Ground)

45.     Schein repeats and realleges every allegation set forth in paragraphs 1 through 44 as if fully set forth herein.

46.     By letter dated June 25, 2009, Global has purported to terminate the Agreement due to alleged material breaches on the part of Schein.

47.     Schein is not in material breach of the Agreement for at least the reasons set forth above.

48.     Schein seeks a judicial determination that Global was not entitled to terminate the Agreement due to any material breach by Schein and in order to clarify the obligations of Global (and Patterson Dental) going forward.

14

49.     As a result of Global's voluntary termination of the Agreement, Global is subject to the one year restrictive covenants in the Agreement.

50.     Because Global has not purported to terminate under Paragraph 1(C ) of the 2002 Amendment and has not tendered the required Breakup Fee, the termination cannot be considered to be under paragraph 1(C) of the 2002 Amendment and the restrictive covenants imposed under Paragraphs 12 and 13 of the 1996 Agreement should apply.

51.     In addition, the Confidentiality Provisions of Paragraph 11 of the 1996 Agreement and certain other provisions, such as those requiring the return of Schein property under Paragraph 10(f) of the 1996 Agreement apply and Global must comply with them.

52.     A substantial, real and justiciable controversy exists between the parties concerning their rights and duties under the Agreement.  The controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment that the Agreement was not properly terminated by Global for material breach.

53.     The Court's determination of the issues presented would be final and conclusive, insofar as the declaratory judgment sought would fully and finally resolve the parties' dispute concerning their rights and obligations with respect to the Agreement.

54.     Schein seeks this relief under 28 U.S.C. §2201, *et seq.*

### COUNT TWO, AGAINST HOLBROOK AND GLOBAL

### (Breach of Contract - Violations of Restrictive Covenants)

55.     Schein repeats and realleges paragraphs 1 through 54 as if fully set forth herein.

56.     On May 1, 2002, Global executed the 2002 Amendment to the 1996 Agreement, by which Global accepted an assignment of the rights and obligations of Schein's exclusive sales agent under the 1996 Agreement.

15

57.     Upon information and belief, Patterson Dental has acquired Global and/or all or substantially all of its assets.

58.     The sale of Global and/or all or substantially all of its assets to Patterson Dental, Schein's competitor, constitutes a breach of the restrictive covenants in the 1996 Agreement, as well of the confidentiality and other provisions of that agreement.

59.     Craig Holbrook acted in concert with Global in breaching the restrictive covenants in the Agreement.

60.     By agreement of the parties (1996 Agreement, Paragraph 12(d) on page 9) and in fact, Schein lacks an adequate remedy at law, as the full nature and extent of its injury will be impossible to quantify, or to demonstrate as a practical matter.

61.     Schein is entitled to temporary, preliminary, and permanent injunctive relief to enforce the restrictive covenants, confidentiality and other provisions contained in paragraphs 10, 11, 12 and 13 of the Agreement.

62.     Schein is entitled to any damages arising out of Global and Holbrook's breach of the restrictive covenants in the Agreement, to the extent that Schein is able to prove any such damages at trial.

### COUNT THREE, AGAINST HOLBROOK AND GLOBAL

### (Breach of Contract – Violations of Confidentiality Provisions)

63.     Schein repeats and realleges paragraphs 1 through 62 as if fully set forth herein.

64.     Global has had access to Schein's Confidential Information during the course of its performance under the Agreement.

65.     Despite purporting to terminate the Agreement, Global has not returned Schein's Confidential Information as required by the Agreement, nor has it made a tender of its return.

16

66.     Schein is entitled to injunctive relief compelling Global and Holbrook to immediately return the originals and all copies of Schein's Confidential Information and other property and preventing Global and Holbrook from utilizing the Schein Information in any fashion or disclosing it to third parties.

67.     Schein is entitled to damages arising out of Global and Holbrook's breach of the confidentiality provisions of the agreement in an amount to be proven at trial.

## COUNT FOUR, AGAINST PATTERSON DENTAL

### (Breach of Contract – Successor Liability)

68.     Schein repeats and realleges paragraphs 1 through 67 as if fully set forth herein.

69.     Upon information and belief, Patterson Dental has acquired the business of Global and is now operating it in conjunction with Holbrook and in violation of the restrictive covenants and other provisions of the Agreement.

70.     Upon information and belief, Patterson Dental is a successor to Global by express or implied assumption, by de facto merger or consolidation, or by operating the post-sale business of Global in continuity with the pre-sale enterprise by using, among other things, the premises, sales force and other resources previously used by Global to conduct the business.

71.     As a successor to Global, Patterson Dental is bound by the restrictive covenants, confidentiality and other applicable provisions of the Agreement, and is liable for their breaches.

72.     Schein is entitled to temporary, preliminary, and permanent injunctive relief against Patterson Dental to enforce the restrictive covenants, confidentiality and other provisions contained in paragraphs 10, 11, 12 and 13 of the Agreement.

17

73.     Schein is entitled to recover any damages from Patterson Dental arising out of Global and Holbrook's breach of the restrictive covenants in the Agreement, to the extent that Schein is able to prove any such damages at trial.

**WHEREFORE**, Schein respectfully requests that the Court:

1.      Enter a declaratory judgment that Global was not entitled to terminate the Agreement due to its claim of material breach;

2.      Issue temporary, preliminary and permanent injunctions preventing Global, Holbrook and Patterson Dental from violating the restrictive covenants and confidentiality provisions of the Agreement;

3.      Issue temporary, preliminary and permanent injunctions requiring Global, Holbrook and Patterson Dental immediately to return to Schein all copies of Schein's Confidential Information and other property in their possession;

4.      Issue temporary, preliminary and permanent injunctions preventing Global, Holbrook and Patterson Dental from utilizing the Schein Confidential Information in any fashion or disclosing it to third parties;

5.      Award actual damages against Global, Holbrook and Patterson Dental, in such amount as may be proven at trial; and

6.      Award Schein its' attorney's fees against Global, Holbrook and Patterson Dental pursuant to Paragraph 17 of the 1996 Agreement (page 11); and

7.      Grant Schein such other and further relief as the Court deems just, equitable and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury on all issues so triable.

Dated: June 29, 2009

PROSKAUER ROSE LLP
*Attorneys for Plaintiff Henry Schein, Inc.*

By: _____

Bruce E. Fader
Scott A. Eggers
Anthony T. Wladyka, III
1585 Broadway
New York, NY  10036
Tel.: 212.969.3000
Fax: 212.969.2900

# Exhibit A

OCT 24 2005 14:21 FR SSD ADMIN          631 390 8041 TO ETTINGER-MIKE      P.08

# EXCLUSIVE
# SALES AGENT AGREEMENT

BETWEEN

## MARK F. HEILBRON
## d/b/a
## M.F.H. CONSULTANTS, INC., AGENT

AND

## HENRY SCHEIN, INC.

April 1, 1996

Post-it® Fax Note   7671   Date 3/29   # of pages ▶ 8

To R. Miranda                  From Norma

Co./Dept. R. Petruzzo          Co.

Phone #                         Phone #

Fax #                           Fax #

AGREEMENT entered into as of the _1_ day of ~~January~~ _April_ 1996, by and between HENRY SCHEIN, INC., having its principal place of business at 135 Duryea Road, Melville, New York 11747 ("HSI"), and ~~MARK F. HEILBRON~~ ("Heilbron"), sole shareholder of and doing business as M.F.H. CONSULTANTS, INC. ("MFH"), each with an address at ~~2895 Ualena Street~~, Honolulu, Hawaii 96819. Heilbron and MFH are individually and collectively, as the context may require, and jointly and severally, with respect to liability, referred to herein as "Agent."

WHEREAS, HSI and Agent are parties to an Exclusive Sales Agent Agreement dated September 30, 1992, wherein Agent was named as HSI's exclusive agent in the Territory (as defined therein); and

WHEREAS, HSI and Agent wish to continue their relationship under the terms and conditions set forth herein.

NOW THEREFORE, in consideration of the foregoing premises and othr good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.      Appointment as Agent.

        (a)     HSI hereby grants to Agent, and Agent hereby accepts from HSI, the exclusive right to sell HSI Products in the Territory (each as hereinafter defined).  Notwithstanding anything to the contrary contained herein, the HSI Products, for the purposes of this Agreement, are specifically limited to the products and services manufactured, produced and distributed by HSI's Dental Division,  HSI's Practice Management Technologies Division ("PMT") and HSI's dental laboratory subsidiary, Zahn Dental Co., Inc.  None of the products and services of HSI's other divisions, subsidiaries and or affiliates are involved in the transactions contemplated under this Agreement.

        (b)     Agent represents, warrants and covenants to HSI that during any term of this Agreement, he will not sell, distribute or market any dental product, supply or service anywhere other than HSI's Products in the Territory in accordance with this Agreement, except as otherwise permitted in writing by HSI.

2.      Term.

        (a)     The initial term of this Agreement shall be from the date initially set forth above until December 31, 1997.  Thereafter, this Agreement will be renewed automatically, for successive terms of one year each, unless either party gives the other written notice of

1

termination within one hundred and twenty (120) days prior to the end of the initial term or any subsequent term.

3.    Territory, Customers and Products.

(a)    Agent shall be HSI's exclusive and independent sales agent for the customers ("Customers") located in the territory consisting of the State of Hawaii ("Territory").  For the purposes of this Agreement, a Customer shall be deemed located in the Territory, if and only if HSI's invoices for Products are forwarded to such Customers at an address in the Territory.

(b)    Notwithstanding the foregoing, Agent represents that he has transacted business with the customers in the areas listed on Schedule A, attached hereto and hereof made a part ("Outside Customers"); Agent acknowledges that HSI transacts business with customers in these same areas.  In order to further the relationship between HSI and Agent, each party agrees to contact the other on a quarterly basis with regards to the Outside Customers which will serve as the basis for calculating Agent's commission, pursuant to the provisions of paragraph 6.

(c)    Further, certain invoices and payments for selected Customers may be processed at locations outside the Territory.  All other Customers shall be reserved to HSI and/or HSI's other agents, if any.

4.    Warehousing and Distribution.

(a)    Agent will maintain and operate, in conformity with all laws and regulations, a warehouse with appropriate capacity to hold sufficient inventory of up to approximately 7,000 sku's of the Products on behalf of HSI.  HSI and Agent will mutually agree on the array, volume and composition of the Products to be warehoused by Agent.  Notwithstanding the warehousing obligation of Agent set forth herein, the inventory of warehoused Products will at all times remain under the ownership and control of HSI.

(b)    To the extent possible, Agent will facilitate the procurement of Products which are hazardous or bulky or do not lend themselves, in HSI's sole discretion, to shipment to the Territory, directly from existing manufacturers' distribution centers in or close to the Territory, in an attempt to save on freight costs from HSI's distribution centers in New York, Indiana and Nevada, as applicable, regardless of whether such Products are for Agent's Customers or Customers of HSI's mail order/telephone solicitation business.

2



(c)    Agent will consult with the President of HSI's Dental Division, or his designee (either of the foregoing, the "Liaison Officer") with regard to the stocking of inventory of Products in the Territory, and will coordinate with such person in order not to duplicate efforts, to minimize inventory carrying costs, to minimize shipping and other freight costs, to facilitate administration and to promote cost efficiencies. All levels of Product inventory and related matters will be monitored and tracked by HSI's Liaison Officer. From time to time, with or without notice, HSI may inspect the warehouse and distribution center to determine conformity with this Agreement. In addition, Agent shall maintain inventory and shipping records in computerized form. Within ten (10) days of the end of each month Agent shall deliver to HSI copies of the reports set forth on Schedule 4(c).

(d)    All costs associated with the operation of the warehouse and distribution center and the delivery of Products warehoused in the Agent's facility to Customers will be at the sole cost and expense of Agent; such cost and expense includes, without limitation, the hiring of personnel, if necessary, the renting of office and warehouse space, the compliance, as applicable, with required conditions for Products, including, without limitation, cost of complying with all facility requirements of HSI's insurance carrier(s), climate control, security, etc., and any other costs and expenses associated with the performance of Agent's duties hereunder. Shrinkage of inventory maintained at Agent's warehouse and distribution center of greater than .5% per annum (the "Shrinkage Factor") shall be Agent's financial responsibility. Agent shall promptly reimburse HSI for all amounts over the Shrinkage Factor upon written notice from HSI. Delivery of products by HSI to Agent's facility will be at the cost and expense of HSI.

(e)    Agent will establish the warehouse and distribution center for the Territory so as to ensure and guarantee that all Products are (i) delivered to Customers on the island of Oahu within a maximum of two days from the day the order is received at such warehouse and distribution center in the Territory, and (ii) delivered to all other Customers as soon as possible, using the fastest means available.

(f)    Agent will insure the warehouse and distribution center for the Territory for the full replacement value of such warehouse and distribution center, and will provide HSI with copies of certificates evidencing such coverage.

(g)    Shipment of bulk merchandise to the Territory shall be coordinated between Agent and the Liaison Officer.

5.    Sales and Administrative Obligations of Agent.

3

(a)    Agent, those who operate his business and work for him, and the entire operations administered by Agent in the Territory, will coordinate all their activities with HSI's Liaison Officer.

(b)    Agent and his office will sell only HSI's Products and no other products, unless otherwise specifically permitted in writing by HSI.  Agent shall focus his attention and that of any personnel in his employ on expanding the sales of HSI Products in the Territory by providing face-to-face sales to dental offices and technical support to Customers with regard to Products.

(c)    Included in those institutions to be visited by Agent and his sales force will be the Dental Hygiene School located in the Territory and a Dental Assistants School also located in the Territory, which institutions will be visited on a regular basis in order to promote HSI Products and services to dental hygiene and dental assistant students.

(d)    Agent will endeavor to establish an ongoing working relationship with the Hawaii Dental Association's Board of Directors and its Education Director to incorporate HSI's seminars and outreach activities into the programs sponsored and developed by the Hawaii Dental Association.

(e)    Agent will coordinate outside sales activities with the telemarketing sales areas within the Dental Division of HSI in order to enhance, build and expand larger and overall inbound sales orders.

(f)    Agent will work with the Dental Division of HSI in order to enhance such Division's sales efforts and contracts with the military and other governmental customers.  In addition, Agent will make regular, face-to-face sales and technical support visits to the individuals involved in making the actual purchasing decisions for Dental Division Customers.

(g)    Agent will provide technical support, trouble-shooting and followup for Customers who have problems relating to the Products or ancillary equipment and products and supplies, and will use his best efforts to solve any such problems which may arise.

(h)    Agent will establish and will develop an independent service organization which will be able to install and repair equipment, supplies and consumables sold through HSI, thus saving time and money on returns, etc. due to the shipping distances involved.

(i)    Agent will assist PMT in promoting PMT's software packages, including those of Dental Plan, Inc., whether or not trademarked as "Easy Dental."

4

(i)      Agent will prepare a proposal for presentation to HSI through its Liaison Officer, which proposal will set forth project recommendations for a sales agency and distribution arrangement between Agent and other HSI affiliates and/or subsidiaries and/or divisions. Such proposal will also define procedures by which such affiliates and/or subsidiaries and/or divisions, as the case may be, may enter into new business arrangements with Agent, as well as new relationships for warehousing of bulky or hazardous Products.

6.       Agent's Commissions and Other Charges.

(a)      Subject to the terms of Section 6(b) hereof, HSI will pay Agent a commission equal to 10% of Net Sales (as hereinafter defined) in the Territory.   As used herein, Net Sales means gross sales ordered by, delivered to and paid for by Customers during any term hereof, less cancellations, cash discounts and rebates, allowances, returns, adjustments, costs of collection and taxes (other than income taxes).

(b)      The parties hereto have increased the Commission payable to Agent from 5% to 10% of Net Sales in expectation that by shifting product fulfillment to the Agent's Hawaii warehouse, HSI's freight costs for Product fulfillment to Hawaii will decrease. In accordance with this goal, the parties agree as follows:

(i)      HSI shall use its reasonable best efforts to maintain stocking quantities of Products in Agent's warehouse in order to permit Agent to fulfill ninety (90) percent of Product orders in the Territory;

(ii)     Agent shall use its reasonable best efforts to adhere to HSI's cycle counting standards (as reasonably adjusted from time to time) and shall supply written documentation of adherence to such standards;

(iii)    Within sixty (60) days of the end of each quarter, during the term of this Agreement, HSI shall conduct a review of the freight costs HSI incurred for such quarter.  In the event HSI's freight costs for shipments of Product into the Territory exceed projected amounts (notwithstanding reasonable adjustments for sales increases), then the parties shall mutually agree on a reduction of the commission payable by HSI to Agent pursuant to this section.  In the event the parties cannot mutually agree on the amount of the adjustment, then HSI, at its election may terminate this Agreement on One hundred and twenty (120) days notice.

(c)      In the event that a Customer requests an emergency delivery of Product from Agent (ie. plane, boat or other such service), and such delivery results in an increase over the Agent's normal delivery cost (the "Additional Cost"), then in such event Agent may pass the

Additional cost on to the Customer. Agent shall submit a monthly report of Additional Costs incurred and billed to the Liaison Officer.

(d) . HSI will pay, on the first day of each month to Agent, a $25,000 draw against total commissions earned the previous month. Any additional commission due and payable for the previous month shall be paid on the 15th day of each month. In the event commissions due and payable for the previous month are less than $25,000, then the amount of such overpayment shall be deducted against the next month's draw.

7.    Costs and Expenses.

(a)    All expenses incurred in sale, warehousing and distribution in the Territory, including any ancillary costs and expenses and fees, will be borne by Agent. The shipping costs for Products from HSI's facilities (in Port Washington, NY; Indianapolis, IN; and Sparks, NV) to the warehouse in the Territory will be the responsibility of HSI.

(b)    All billing and collecting of accounts receivable from Customers will be the responsibility of HSI.

(c) . HSI will notify Agent, within 30 days of the execution of this Agreement, of the type and extent of the insurance HSI will carry to cover the Products in the Agent's warehouse established in the Territory, so that Agent can assume the insurance obligations from the point when and where HSI's coverage is no longer in effect for the Products.

8.    No Resale.

Agent shall use his best efforts to prevent any Customer from reselling or otherwise redistributing any or all of the Products outside the Territory. Agent further covenants that, in the event he discovers any Customer selling or distributing the Products outside the Territory, Agent shall immediately stop selling the Products to such Customer and shall promptly notify HSI of such resale or redistribution.

9. .    Marketing, Promotion and Pricing.

(a)    HSI will at all times, and in it's sole discretion, control and determine pricing, and discounts, rebate and related policies for any and all Products. To the extent commercially practicable, HSI will notify Agent in advance of modifications to pricing and such related policies.

8

(b)    HSI may from time to time, in its sole and absolute discretion, change the prices of Products and the terms and conditions of sale and/or cancel or consent to the cancellation by Customers of any order in whole or in part after acceptance thereof and/or accept any and all returns of merchandise from, or grant allowances to, Customers.

(c)    HSI will continue to promote and market the Products in the Territory in substantially the same manner as it has done heretofore. Notwithstanding the foregoing, HSI will at all times have the absolute and unfettered control over the marketing and promotion of any and all of the Products, including the right to modify, delete from or change any existing or planned promotional or marketing program.

(d)    Agent, at the HSI Liaison Officer's request, will assist in developing any technical and/or promotional support materials required for the promotion and marketing of the Products within the Territory. Upon HSI's reasonable acceptance of the support materials, HSI shall reimburse Agent for his expenses in assisting in the preparation thereof upon submission by Agent of appropriate backup documentation therefor.

(e)    HSI will provide to Agent feedback, via hard-copy printout if available, as soon as commercially reasonable, so that Agent can monitor the types of Products that Customers are purchasing.

10.    Agent as Independent Contractor.

(a)    Nothing contained in this Agreement shall be construed so as to constitute Agent as HSI's partner or employee, or so as to establish any other relationship between Agent and HSI other than as explicitly set forth herein. The mutual intent of HSI and Agent is for Agent to remain at all times an independent contractor responsible for his own actions.

(b)    Agent may not to enter into any agreement and/or assume and/or create any obligation, express or implied, on behalf of HSI, except with HSI's specific prior written approval. Subject to the limitations set by, and the relationship described above between, HSI's Liaison Officer and Agent, Agent shall be free at all times to conduct his business in such manner as he sees fit and to expend such portion of his time, energy and skill during regular business hours, as he deems appropriate.

(c)    Notwithstanding the foregoing, Agent agrees that he shall visit Customers regularly and that he shall furnish to HSI on the 10th day of each month a monthly summary customer update.

(d).    Agent shall provide, and be solely responsible for, compensation arrangements, unemployment insurance, worker's compensation and any and all other insurance which may

7

13

be required under any governmental authority in the Territory for any employee which Agent, in his sole discretion, desires to employ.

(e) · Agent will pay any and all travelling, office and all other expenses which Agent may incur in connection with the operation and conduct of Agent's business as set forth herein. Agent agrees that his sole and only compensation shall be the commissions payable to Agent as set forth above.

(f) Any and all books, Customer records, advertising material, samples, and other property which may from time to time be entrusted or delivered to Agent by HSI, shall be and remain HSI's sole and exclusive property and shall be returned to HSI either immediately upon termination of this Agreement or upon HSI's demand at any time prior thereto. Agent shall not be entitled to any payments under this Agreement unless and until Agent complies fully with the provisions of this paragraph.

11. Confidentiality.

Agent, on his or its own behalf and on behalf of any and all of his or its employees, hereby agrees, at any time not to divulge, use, derive any monetary or economic benefit from or make accessible to any person or business entity, any of HSI's or its affiliated companies' trade secrets, and/or confidential or proprietary information including, but not limited to, the identity of or lists of customers, customer's needs and requirements, business methods, operational procedures, cost and price information, organizational and/or other business or financial information, or any other information for or incidental to the manufacture, marketing, or promotion of Products, or the business structure or related elements or areas of HSI's organization or the organization of any of its affiliated companies (all such information or any part thereof, the "Confidential Information") without the prior written consent of HSI, unless such Confidential Information becomes or is, prior to the date hereof, public knowledge other than by being divulged or made accessible by Agent and/or any employee of Agent.

12. Restrictive Covenants.

(a) Agent covenants and agrees that Agent will not, at any time during any term hereof, directly or indirectly, within the Territory or within any other geographical area or territory where the business of HSI or any subsidiary or affiliate of HSI is presently being conducted or may from time to time be conducted by HSI during such time: own, manage, operate or control, or participate in the ownership, management, operation or control of, or be connected with or have any interest in, as an employee, consultant, advisor, agent, owner, partner, co-venturer, principal, director, stockholder, lender or otherwise, any business or enterprise that is competitive with any significant part of the business conducted by HSI or any

8

(14)

subsidiary or affiliate of HSI during such period; provided, however, that nothing contained herein shall prohibit Agent from owning, in the aggregate, directly or indirectly, less than 1% of any class of securities listed on a national securities exchange or traded publicly in the over-the-counter market.

(b)     If this Agreement terminates for any reason other than (i) the material breach thereof by Agent or (ii) at the request of Agent (in which circumstance the restrictive covenants set forth in sub- paragraph 12 (a) above shall remain in effect for one year past such termination date), the restrictive covenants set forth in subparagraph 12 (a) above shall then no longer be imposed upon Agent.

(c)     If any provision of either paragraph 11 or paragraph 12 of this Agreement is held by a court of competent jurisdiction to be unenforceable because of the scope, duration or area of its applicability, the court making such determination shall have the power to modify such scope, duration and/or area, and such modified provision shall then be applicable in such modified form.

(d)     . Since HSI will be irreparably damaged if the provisions of either paragraph 11 or paragraph 12 are not specifically enforced, HSI shall be entitled to an injunction restraining any violation of such paragraphs (without any bond or other security being required), or any other appropriate decree of specific performance, without the necessity of showing any actual damage or that monetary damages would not provide an adequate remedy. Such remedies shall not be exclusive and shall be in addition to any other remedy, including, without limitation, the remedy of money damages, which HSI may have at law or equity as a result of any such violation.

13.     Termination for Material Breach.

(a)     (i) In the event of a material breach of this Agreement by Agent, HSI shall have the option to terminate this Agreement. If HSI elects to terminate this Agreement, HSI shall give Agent written notice of such election with the resulting termination to take effect no sooner than 30 days after Agent receives such notice. During such 30 day period, Agent will be allowed to cure said material breach. Failure to notify does not constitute a waiver of any such breach, but, rather, precludes HSI's use of that particular breach as the basis for a termination until notice, as set forth above, is given;

(ii) Agent acknowledges that any failure to employ his or its best efforts in the performance of the provisions of this Agreement will result in significant injury to HSI, which may not be compensable by the award of monetary damages. As such, and notwithstanding anything to the contrary contained within this Agreement, Agent agrees that failure to utilize his or its best efforts to fulfill his or its obligations under this Agreement or Agent's voluntary

9

15

termination of this Agreement will result in the imposition of the restrictive covenant set forth in sub paragraph 12 (a), above, for a period of not less than one year from the date of such failure to utilize his or its best efforts or such voluntary termination.

(b)   In the event an application is made to have either party declared a bankrupt, or in the event a receiver or trustee is appointed for a party, or in the event either party transfers a substantial portion of its assets for the benefit of its creditors, then the other party may, at its option, cancel this Agreement upon 10 days written notice.

14.   Audits.  To ensure compliance with this Agreement, each party shall have the right, at its own cost and expense, to inspect the other party's books and records upon 10 business days' written notice.  Any such audit shall occur during normal business hours.

15.   Severability.  If any provision of this Agreement is held invalid or unenforceable, this Agreement shall be considered divisible as to such provisions and the remainder of the Agreement shall remain valid and binding as though such invalid or unenforceable provisions are not included therein.

16.   Applicable Law; Disputes.

(a)   This Agreement shall be construed and interpreted solely in accordance with the laws of the State of New York, without regard to its conflicts of laws provisions.

(b)   The parties irrevocably submit to the exclusive jurisdiction of either the New York State Supreme Court, Nassau County, or the United States District Court for the Eastern District of New York over any action, suit or proceeding arising out of or relating to this Agreement.  The parties irrevocably waive, to the fullest extent permitted by law, any objection which they may now or hereafter have to the laying of the venue of any such action, suit or proceeding brought in such a court and any claim that any such action, suit or proceeding brought in such a court has been brought in an inconvenient forum.  The parties agree that a final judgment in any such action, suit or proceeding brought in such a court shall be conclusive and binding upon the parties and may be enforced in the courts of Hawaii (or any other courts of the jurisdiction to which the parties are or may be subject) by a suit upon such judgment.

(c)   Agent agrees to notify HSI, within 45 days of the execution of this Agreement, of the name and address of his agent within the State of New York who is authorized (and who agrees in writing) to accept service of process on behalf of Agent.  In the event that Agent desires to change this authorized agent for the receipt of process, he may do so effective 14 days after HSI's receipt of written notification of the name and address of any such newly authorized agent.  Agent agrees that all proceedings, notices and documents served upon

such authorized for the service of process shall confer personal jurisdiction upon Agent in the State of New York and shall be deemed to have been properly served upon Agent. Agent further agrees to execute any additional documentation necessary or convenient to authorize such agent. In the event Agent fails to designate an agent for service of process in accordance with this paragraph, by his execution hereof Agent hereby designates the Secretary of State of the State of New York as his authorized agent to accept service of process on behalf of Agent hereunder and to otherwise subject and bind Agent as set forth in this paragraph.

17.    Attorneys' Fees.   If any legal action is necessary to enforce the terms of this Agreement, the prevailing party will be entitled to reasonable attorneys' fees, in addition to any other relief to which that party may be entitled.

18.    Entire Agreement; Amendment. This Exclusive Sales Agent Agreement constitutes the entire agreement between the parties relating to the subject matter hereof.  All prior agreements or arrangements, written or oral, between the parties relating to the subject matter hereof are hereby canceled and superseded.  This Agreement may not be amended except in writing signed by both parties.

19.    Waiver.  The failure of either party at any time to require performance by the other party of any of the provisions hereof shall not affect in any way such party's right to require full performance at any time thereafter,  nor shall the waiver by either party of a breach of any provision hereof be taken or held to be a waiver of any subsequent breach of the same or any other provision hereof.

20.    Agreement Binding.  This Agreement and all its provisions shall inure to and become binding upon the successors and assigns of the parties hereto.

21.    Assignment.  Except as set forth below, neither party may assign or delegate any right or obligation hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld.  Any attempted assignment or delegation in violation hereof shall be void.  Notwithstanding the foregoing, HSI shall specifically be permitted without notice to Agent and without Agent's permission, at any time, to assign all or any portion of its rights, benefits, and/or obligations pursuant to this Agreement to a direct or indirect successor corporation which conducts the healthcare distribution business substantially in the form presently conducted by HSI.  Thereafter, Agent shall look only to such successor corporation to fulfill any of HSI's payment or performance obligations hereunder.

22.    Notices.  Any notices required or permitted by this Agreement, or given in connection herewith, shall be in writing and may be by personal delivery or by first-class registered or certified mail, postage prepaid, or by telegram or facsimile or by overnight delivery service.

11

Notices to Agent shall be delivered or addressed to Mark F. Heilbron, 2895 Ualena Street, Honolulu, Hawaii 96819; Fax No. (808) 833-1338. Notices to HSI shall be delivered or addressed to Henry HSI, Inc., 135 Duryea Road, Melville, New York 11747, Attention: Chairman of the Board, with a copy to its General Counsel; Fax No. (516) 843-5875.

23.   Headings.  The headings at the beginning of each paragraph of this Agreement are solely for the convenience of the parties and do not have any legal significance.

24.   Counterparts.  This Agreement may be executed in one or more counterparts, by manual or facsimile signature, all of which, taken together, will constitute one and the same Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed on the 2 day of April, 1996.

HENRY SCHEIN, INC.

By: _____
President-North American
   Dental Group

AGENT:

_____ 4/3/96
Mark F. Heilbron

M.F.H. CONSULTANTS, INC.

By: _____ 4/3/96
   Mark F. Heilbron, President

12

18

## INTRODUCTION

Through this agreement, the organizations listed establish a mutually beneficial relationship that seeks to satisfy strategic business goals sought by each entity. Integrated Services, Inc., through its agent, Dental Services Management (DSM), has a business need to provide value added services to its client's (HMSA) customer constituency (HMSA Participating Providers). Henry Schein, Inc. (H.S.I.) and M.F.H. Consultants seeks increased growth in the Hawaii market. This Strategic Business Alliance results in a positive benefit to all organizations. With the successful implementation of this relationship, H.S.I. becomes DSM's source for products and services within and beyond the scope of this alliance.

## I.   DEFINITIONS

1.1   Terms used throughout this Agreement are defined as follows:

**DSM** - Dental Services Management it a subsidiary of HMSA whose mission is to develop and implement products, technologies, resources and support services to facilitate the advancement of HMSA participating providers. DSM administers HMSA's Dental and Medical Group Purchase Programs.

**HMSA** - Hawaii Medical Service Association is a member owned mutual benefit assurance organization providing prepaid health plans to the people of Hawaii. HMSA is an independent plan operating under a license with the Blue Cross and Blue Shield Plans ("the Association") permitting HMSA to use the Blue Cross and Blue Shield Service Mark in the State of Hawaii. Neither DSM nor HMSA is contracting as the agent of the Association.

**HENRY SCHEIN, INC.** - A direct marketer of health care products and services to office-based healthcare practitioners, including dental practices and laboratories,

1

physician practices and veterinary clinics. Henry Schein, Inc. is a contracted participant in the AmeriNet group-purchasing cooperative.

**AMERINET** - A national group purchasing cooperative. AmeriNet contracts for delivery of hospital-level pricing for Physician Group Practices, Clinics, Surgery Centers and Managed Care Organizations. DSM has entered a group-purchasing contract with AmeriNet/Intermountain Healthcare, Inc. (AmeriNet) to provide discounts on medical and non medical products, supplies, and equipment for HMSA participating health care providers.

**PROGRAM CONSTITUENTS** - HMSA's Health Care contracted providers eligible to participate in this program. There are approximately 2,500 licensed providers of Health Care Services in the State of Hawaii who have contracted with HMSA. Any reference to the "Program" in this document is meant to be the HMSA Health Care Providers enrolled in the AmeriNet Group Purchase Program.

**M.F.H. CONSULTANTS** - A Hawaii based supply warehouse manager, distributor and product representative for Henry Schein, Inc.

**MEDICAL SUPPLIES** - Those products and services distributed by Henry Schein, Inc. as contracted between Henry Schein and AmeriNet or through its catalogs.

**DISCOUNT** - The agreed amount contracted by Henry Schein with AmeriNet.

**ADMINISTRATIVE FEE** - The amount agreed to be paid by Henry Schein, Inc. to DSM.

## II.  CONTRACT AGREEMENTS

2.1     DSM agrees to:

a. Promote Henry Schein as its vendor of choice to Program Constituents.
Promotion of Henry Schein and its products will be affected through the following:
- DSM/AmeriNet individual and group presentations to Program Constituents
- HMSA quarterly provider updates
- HMSA Provider Services Field Representative presentations to Program Constituents
- DSM promotional flyers and locally produced medical journals
- DSM participation at annual Hawaii Medical Association Conventions
- Other promotional activities as agreed to by Henry Schein/DSM

b. Provide the following administrative support to Henry Schein, Inc.:
- Demographic information on all eligible Program Constituents
- Resolution of questions relating to Program Constituent issues or disagreements concerning Henry Schein, Inc. or its local distributor.
- Provide documentation on additions and deletions of providers enrolled in the AmeriNet Program

2.

- Assist in developing marketing material with Henry Schein, Inc. for local distribution
- Sponsor/host high-tech open houses, continuing education presentations, or similar programs as agreed to with Henry Schein, Inc.

2.2     HENRY SCHEIN, INC. agrees to:

a. Promote, with DSM, the Schein Med/Surg & Pharmaceutical Formulary of Products and the AmeriNet Program to HMSA health care providers not already enrolled in the Program

b. Strive to warehouse locally.

c. Pay a 2% administrative fee to DSM derived from total monthly purchases by Program participants

2.3     M.P.H. CONSULTANTS agree to:

a. Deliver products and services in a timely and efficient manner

b. Assist in resolving questions relating to Constituent/vendor disagreement or issues that cannot be resolved by DSM.

## III. OPERATIONAL AGREEMENTS

3.1     DSM and Henry Schein, Inc. (H.S.I.) agree that H.S.I. will:

a) Provide monthly reports of all sales activity generated by Program to be received by DSM no later than the 20th of the month for the previous month's sales. Confidentiality of this information is mandatory and remains the property of H.S.I.

b) Provide payment of the administrative fee to DSM quarterly.

3.2     Program participant eligibility notifications, deletions, and other changes will be submitted to H.S.I. as necessary in hard copy formats.

3.3     There are no penalties for deletion or re-addition of Program participants which may occur because of their HMSA participating eligibility.

3.4     DSM agrees to have documents describing operational processes, advertisements, and/or mailings using H.S.I.'s name reviewed and agreed to by H.S.I. prior to release.

3.5     Program participants are subject to the credit and terms of sale as they apply to customers of H.S.I.

(3)

## IV. Termination

This Agreement shall be in effect from the date this Agreement is executed by both DSM and H.S.I./M.F.H. and shall have a term of three (3) years from the above referenced date.

If for any reason, either party is unable to fulfill its commitments under this agreement because of the other's actions interfering with the obligations of that party, the contract may be terminated prior to the end of the contract period with 120 days written notice to the interfering party.

## V. Limitation of Liability

Notwithstanding anything to the contrary in this Agreement, it is expressly agreed that DSM shall in no event be liable for any consequential damages occurring out of or in connection with the delivery, use, or performance of H.S.I. or Medical Supplies, except to the extent of their own negligence, willful misconduct or omission.

H.S.I. agrees that DSM, except to the extent of their own negligence, willful misconduct, or omission, will not be liable for H.S.I. lost profits or any claim or demand against H.S.I. by any other party. H.S.I. agrees to indemnify and hold DSM, its officers, agents, and/or employees harmless for any loss, cost or expense suffered or incurred, including attorneys' fees arising out of any negligent act, willful misconduct or omission of H.S.I.

DSM agrees to indemnify and hold H.S.I. harmless from and against any and all claims, loss, damages, liability, costs, expenses (including reasonable attorneys' fees), judgments or obligations whatsoever, for or in connection with or resulting from the negligent act or failure to act or willful misconduct of DSM, its employees, officers, or agents in connection with this agreement.

All disputes arising between the parties under this Agreement shall be settled by arbitration conducted in accordance with the Commercial Arbitration rules of the American Arbitration Association, then in effect, by one arbitrator appointed in accordance with such rules. The parties will cooperate with each other causing arbitration to be held in as efficient and expeditious a manner as practicable. The following provisions also apply:

a. Any arbitration proceeding shall be brought in Honolulu, Hawaii.

b. Any award rendered by the arbitrator shall be final and binding upon the parties hereto. Judgment upon the award may be entered in any court of record of competent jurisdiction. Each party shall pay its own expense of arbitration and the expenses of the arbitrator shall be equally shared unless, in the opinion of the arbitrator, any claim by a party arbitrator may in his/her discretion assess as part of their award, all or any part of the arbitration expenses of the other party raising such unreasonable claim, defense or objection. Nothing herein shall prevent the parties from settling any dispute by mutual agreement at any time.

c. All parties of this agreement each irrevocably and unconditionally consent to the jurisdiction of any such proceedings and waive any objection that it may have to personal jurisdiction or the laying of venue of any such proceeding.

H.S.I. and M.F.H. warrants that any goods and services, or the provision of goods and services, provided pursuant to this Agreement will not be adversely affected by the calendar change to the year 2000.

IN WITNESS WHEREOF, Dental Services Management, M.F.H. Consultants, and Henry Schein, Inc. have caused this Agreement to be executed by their duly authorized and empowered officers or representatives as of the dates set forth below.

For HENRY SCHEIN, INC.

_____   8/17/98
Stephen Neely              Date
Vice President,
Corporate Accounts & Business Development
Henry Schein, Inc.

For M.F.H. CONSULTANTS

_____   8/5/98
Mark Heilbron              Date
President,
M.F.H. Consultants

For DENTAL SERVICES MANAGEMENT

_____   8/4/98
Michael Spital             Date
Vice President,
Dental Services, Inc.

5

# Exhibit B

MAY 14 2002 17:53 FR HSI DENTAL OPS        5163900012 TO 918009532442        P.02



## AMENDMENT TO EXCLUSIVE SALES AGENT AGREEMENT

This Amendment (this "Amendment") to the Exclusive Sales Agent Agreement (the "Agreement") by and between Henry Schein, Inc. ("HSI") and Global Medical & Dental ("GMD" also referred to herein as the "Agent") is made and entered into this ___1st___ day of May, 2002.

WHEREAS, HSI entered into the Agreement with Mark F. Heilbron d/b/a M.F.H. Consultants, Inc. (MFH") on April 1, 1996;

WHEREAS, MFH assigned the Agreement to GMD and GMD shall have the exclusive right to sell HSI products within territory, and HSI hereby consents to such assignment; and

WHEREAS, both HSI and GMD desire to amend the Agreement to better suit the arrangement of the parties.

NOW, THEREFORE, in consideration of the covenants and conditions contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, HSI and GMD intending to be legally bound thereby, have agreed and do hereby agree as follows:

1.    Term.

A.    The initial term of the Agreement shall be from the date initially set forth above until December 31, 2002. For a period of thirty (30) days following the expiration of the initial term, HSI shall have the right to terminate the Agreement upon five (5) days' written notice thereof to GMD in the event GMD or Craig Holbrook have been Negligent (as defined herein). For purposes of this Agreement, the term "Negligent" shall be satisfied should HSI (i) receive overwhelming negative customer reaction regarding GMD or Craig Holbrook, (ii) experience a significant sales representative retention issue other than for cause, or (iii) experience a significant and potentially permanent distribution interruption. Should HSI fail to so terminate the Agreement within such thirty (30) day window, the Agreement shall be automatically extended until December 31, 2015 (the "Extended Term"). Upon expiration of the Extended Term, the parties may agree to further extend the term of the Agreement by an additional five (5) year period.

B.    If in any calendar year HSI's sales attributable to the State of Hawaii for which GMD is commissioned for (the "Hawaii Sales") do not increase by a minimum of 3.5% over the prior years' sales, HSI shall have the right upon sixty (60) days' written notice to GMD to terminate the Agreement. GMD shall have the ability to cure such deficit and thereby avoid termination of the Agreement by:

1454309.1.054252-00001

MAY 14 2002 17:53 FR HSI DENTAL OPS       5163908012 TO 918089532442      P.03

(i)   documenting that the lack of sales growth is due to
(a) stagnation or contraction of the Hawaii markets,
(b) significant vendor disruption and/or change or
(c) significant change in the industry; or

(ii)  acknowledging HSI's notice and providing an
outline of sales activities to be implemented over
the next one hundred-eighty (180) days. If in the
last ninety (90) days of the one hundred-eighty
(180) day grace period the Hawaii Sales increase at
a rate of 3.5% or greater, GMD shall have been
deemed to cure its default and the notice of
termination shall be deemed to be of no further
effect.

C.     GMD shall pay to HSI an amount equal to the commissions received by GMD for
the prior twelve (12) months (the "Breakup Fee") if (i) GMD elects to terminate the Agreement
and compete with HSI in the dental market, other than for a breach by HSI (subject to any cure
rights) and/or (ii) HSI terminates the Agreement due to GMD's decision to distribute competitive
products from a different source than HSI, subject to any cure rights. Upon payment of the
Breakup Fee by GMD to HSI, the Agreement shall be terminated and neither party shall have any
further obligations to the other.

2.     Commission.
A.     GMD shall earn a commission equal to 31.70% of the Gross Profit Dollars,
as hereinafter defined, generated from dental sales (excluding special markets (DSM) sales) in the
Hawaii territory. Gross Profit Dollars shall be reduced by any rebates paid to customers in the
Hawaii territory. GMD shall be entitled to a forty thousand dollar ($40,000.00) per month draw,
with monthly reconciliations and repayment, if applicable, to be paid by the 17th of the month.
"Gross Profit Dollars" shall be calculated as follows: The cost basis for the gross profit
calculation is the current vendor wholesale price to HSI (file cost) plus a charge for freight not to
exceed seven percent (7%). Gross Profit Dollars will be reduced by customer and association
rebates paid. If any change is made to the freight charge percentage, GMD will be notified and
the commission rate will be adjusted proportionately. GMD has the right to review HSI item cost
system and calculation.

B.     GMD will be paid 8% on all special market sales up to January 1, 2003. GMD
needs to meet with the special markets group to negotiate a new commission rate and process to
sell to special market accounts in Hawaii. The new agreed upon commission rate will be
implemented no later than January 1, 2003. The new Commission Calculation will be Mutually
agreed to and not unreasonably withheld.

1454309.1.054252-00001

May-30-2002  09:35am   From-MFH CONSULTANT INC      +18088831338       T-361   P.003/007   F-692

MAY 14 2002 17:54 FR HSI DENTAL OPS        5163900012 TO 910009532442      P.04

C.    HSI and GMD agree that freight expense for shipping product to customers and freight recovery (handling fees) collected from customers will be analyzed and incorporated into the commission calculation no later than January 1, 2003. The change to the commission calculation will be mutually agreed to and not unreasonably withheld by both HSI and GMD. The initial inclusion of freight in the commission calculation will not reduce GMD's commission dollars as based on the last 12 months results of sales, GP, and ~~freight recovery amounts currently~~

3.    Price Adjustments, Sale Plans, and Freight Terms.

HSI, with GMD's input, shall set price adjustment guidelines, authorize all sale plan offers and set freight policies for the Hawaii territory.

4.    Medical Rights.

It is understood that the assignment of HSI's medical distribution rights to GMD within the Hawaii territory is of material importance to GMD. If the initial assignment of HSI's medical distribution rights to GMD is unreasonably withheld for a period of greater than one hundred-twenty (120) days from the date hereof (the *"Medical Window"*); GMD may terminate the Agreement upon thirty (30) days' written notice to HSI. GMD shall have thirty (30) days from the expiration of the Medical Window in which to elect to proceed with such termination. Upon such termination, GMD shall not be obligated to pay the Breakup Fee and the parties shall have no further obligation to the other.

5.    Non-Competitive Product Offerings.

Nothing contained herein shall limit GMD's right to market other products within the Hawaii territory so long as such products do not compete with any product offered by HSI, including its subsidiaries and divisions ("Non-Competitive Product"). However, should HSI incorporate into its product offerings a line of products that will compete with a Non-Competitive Product, which is currently offered by GMD pursuant to this provision, then GMD shall be obligated to transition such product offering to the HSI line within one hundred-twenty (120) days.

6.    Equipment.

GMD will be able to purchase equipment at cost plus 10% and will pay delivery charges from vendor/SSD to GMD or customers.

7.    Consent.

Page -3-

May-30-2002 08:38am  From-MFH CONSULTANT INC        +18088331338        T-361  P.004/007  F-692

HSI hereby consents to the assignment of the Agreement by MFH to GMD, as of the date hereof.

8.    Miscellaneous.

Except as hereby amended, all of the other terms and conditions of the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment as of the day first written above.

HENRY SCHEIN, INC.

By: _____
Name: Richard Mirando
Title: Sr. Vice President
         6|3|02

GLOBAL MEDICAL & DENTAL

By: _____
         Holbrook

Page -4-

1454309.1.054252-00001

# Exhibit C

## SECOND AMENDMENT DATED AS OF OCTOBER 26, 2005
## TO EXCLUSIVE SALES AGENT AGREEMENT

Reference is made to the Amendment to the Exclusive Sales Agent Agreement (the "First Amendment") between Henry Schein, Inc. ("HSI") and Global Medical & Dental ("GMD") dated as of May 1, 2002, which amended the Exclusive Sales Agent Agreement dated April 1, 1996.  The parties to the First Amendment agree to hereby amend the First Amendment as provided below as of the date set forth above in the caption:

Section 2.A.   Commission.

The commission rate set forth in Section 2.A of the First Amendment shall be increased from 31.71% to 40.0%, effective as of January 1, 2005.

Section 6.     Equipment.

Section 6 of the First Amendment shall be removed and replaced in its entirety by the following:

GMD may purchase dental equipment directly from dental equipment vendors for sale in Hawaii.  HSI will provide reasonable assistance, if commercially feasible, to GMD to enable GMD to make its dental equipment purchases directly from dental equipment vendors; provided that GMD cooperates with HSI by providing all necessary data and assistance required for HSI to provide such assistance.

Other than as amended hereby, the First Amendment will remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have duly executed this agreement as of the date written above in the caption.

HENRY SCHEIN, INC.

By: _____
David Steck
Vice President & GM

GLOBAL MEDICAL & DENTAL

By: _____
Craig Holbrook
CEO

# Exhibit D

**GLOBAL MEDICAL & DENTAL**
91-291 Kalaeloa Blvd. Unit C-1, Kapolei, Hawaii 96707

May 22, 2009

**VIA CERTIFIED MAIL / RETURN RECEIPT REQUESTED AND U.S. MAIL**

Dear Chairman Bergman:

Re:    Notice of Multiple Breaches of Contract and Demand for Cure

I write concerning four material breaches by Henry Schein, Inc. ("**HSI**") of the Exclusive Sales Agent Agreement dated June 3, 2002 (as amended) between HSI and Holbrook Enterprises, LLC *dba* Global Medical & Dental ("**GMD**"). I refer to that agreement herein as the "**GMD-HSI Agreement.**" GMD hereby demands that HSI cure the breaches within thirty days of the date of this letter, which cure includes HSI providing GMD with an accounting of unpaid and diverted commissions, in violation of GMD-HSI Agreement. Below, I give the bases for this notice of breach and demand for cure and accounting under GMD-HSI Agreement.

**Breach of Section 2.A. (as per the 2002 Amendment) Concerning GMD's Right to Commissions on Equipment Sales.** HSI's first breach concerns HSI's failure to pay GMD commissions on HSI dental sales of products and equipment sold in the Territory. Territory is defined in Section 3 as consisting of the State of Hawaii. Under Section 2.A of the GMD-HSI Agreement, GMD is entitled to a commission of 40% on *all* equipment products and services sold in the Territory during the term of the GMD-HSI Agreement. Section 2.A. provides: "GMD shall earn a commission equal to 40% of the gross profit dollars, as hereinafter defined, generated from dental sales[.]" "Dental sales" includes any equipment products and services. Other than military sales,[1] any sale of HSI's products equipment or services with the Territory yields a commission for GMD of 40% of the gross profit dollars of such sale. There are no exceptions. HSI has violated Section 2.A. during the entire term of the GMD-HSI Agreement, and HSI continues violate Section 2.A.

I have repeatedly raised non-payment of commissions on equipment with HSI, through its authorized representatives. In November 2008, I exchanged emails with Jack McKay, pointing out that HSI had paid no commissions for equipment GMD sold for HSI. On November 18, 2008, Mr. McKay responded that his spreadsheet did not factor in large equipment or E4D sales in the commission calculation. An error by HSI in setting up its electronic payment system does not avoid HSI's obligation to make the payments required under Section 2.A. of the GMD-HSI Agreement.

For example, GMD has sold and installed 3 e4D CAD/Cam systems in Hawaii with a 4th to be installed in August. GMD introduced the e4D CAD/CAM system at their 5th Annual

---

[1] Military sales are special market sales which, under 2.B. of the GMD-HSI Agreement, are subject to an 8% commission.

Chairman Bergman
Page 2
May 22, 2009

Technology Expo August 21, 2008. This event was begun with a "Thought Leaders Dinner" on CAD/CAM August 20, 2008 which kicked off CAD/CAM for e4D in Hawaii. All of these events were paid for exclusively by GMD. GMD has trained Dental Service Technicians whom have installed, serviced, as well performed preventative maintenance all with no compensation from HSI. The reason for e4D sales in Hawaii are GMD.

In an email dated September 20, 2007 Dave Steck (Vice President & General Manager of HSI Dental) begins the process of trying to shirk the responsibility and change the terms of the agreement by stating the commission rate on e4D would be 30% and that "I promise you will sell some in 2008 and in 2009 it will be one of your biggest growth drivers". He goes on to say "We will have to sell the e4D to the dentist and commission Global". Mr. Steck is somewhat correct in the fact that GMD has sold e4D's in both 2008 and 2009 and that it is a growth driver, but again HSI has neglected to commission GMD at any commission rate let alone a rate below the contracted rate which is unacceptable and contrary to the terms of the agreement.

In an email dated July 31, 2008 John DeMark (e4D Product Manager) requested to "discuss arrangements on e4D sales" I called to discuss and Mr. Demark laid out a commission structure that again would reduce commissions to a mere 15% of Gross Profit. I listened politely as he laid out a plan and had no intention of accepting a reduction in commissions.

I responded immediately to Dave Steck in an email dated July 31, 2008 and recounted his email from September of 2007 where he "guessed" the commission would be around 30%. During this time we again are trying to clear calendars to discuss the acquisition of GMD. Dave Steck again in this email tries to reduce commissions on one of our "growth drivers" to now 15% of gross profit from the contractual 40% of Gross Profit. The definition of gross profit is clearly defined in the Contract and no extraneous expenses mentioned by Mr. Steck or Mr. Demark are included. After the sale of this equipment and emails in November to Jack McCay the issue was also brought up to Brandon Darcangelo e4D Specialist, whom in turn requested payment to both Bill Rotert, e4D Western Regional Manager as well John Demark e4D Product Manager. No payment was made and more hurdles were put in GMD's way by now asking for GMD to submit additional information to receive payment. HSI has all of the information for sales of e4D's in Hawaii and has reported their sales in quarterly conference calls to investors, revenue numbers reported as a public company and as well product category mix as to the growth of CAD/CAM. GMD has paid commissions on all installed e4D's to it's sales team to help keep them motivated to sell this equipment while attempting to correct the situation with HSI.

The four e4D sales made in Hawaii were to:

Dr. Cheung
Dr. Ching
Dr. Sunahara
Dr. Koga

Chairman Bergman
Page 3
May 22, 2009

For the past two years alone, I calculate that HSI owes GMD commissions on equipment totaling at least $120,000. HSI also owes GMD for commissions on sales GMD before that period, which amount can be calculated upon HSI providing GMD with a proper accounting.

Additionally GMD has not been paid commission for dental sales in the Territory including without limitation Ora Pharma, Camlog, and Pentron Alloy.

Section 2.A. has never been amended pursuant to Section 18.

**Breach of Section 2.A. (As per the 2002 Amendment). Concerning GMD's right to commissions on all merchandise and equipment sales.** HSI's agent or associate, Nephron Dental, has physically attended various conventions and dental related activities in Hawaii, and while at those conventions and activities, has sold merchandise and equipment to dentists and dentists' clinics located in the Territory. Any and all sales made by Nephron Dental from and after June, 2002 to current date, in the Territory are subject to the requirement that HSI pay to GMD contractually required commission on all such sales. Additionally allowing Nephron Dental to make any sales in the territory is a breach of Sections 1(a) and 3(a) concerning GMD's exclusive right to sell HSI Products as defined under Section 1(a) of the GMD-HSI Agreement.

**Breach of Sections 1(a) and 3(a) (per the initial agreement with MFH and Mark Heilbron, assigned to GMD) Concerning GMD's Exclusive Right to Sell PMT Products and Services.** HSI's third breach concerns HSI's failure to honor GMD's exclusive right to sell, among other things, HSI's Practice Management Technologies Division's ("PMT") products and services throughout the Territory (as defined in the GMD-HSI Agreement). Section 1(a) of the GMD-HSI Agreement granted GMD the exclusive right to sell PMT products and services which include without limitation Dentrix, Easy Dental, Hi Tech Equipment, Digital Equipment and all upgrades and related services. Section 1(a) provides: "(a) HSI hereby grants to Agent, and Agent hereby accepts from HSI, the exclusive right to sell HSI Products in the Territory (each as hereinafter defined). Notwithstanding anything to the contrary contained herein, the HSI Products, for the purposes of this Agreement, are specifically limited to the products and services manufactured, produced and distributed by HSI's Dental Division. HSI's Practice Management Technologies Division ("PMT") and HSI's dental laboratory subsidiary, Zahn Dental Co., Inc. None of the products and services of HSI's other divisions, subsidiaries and or affiliates are involved in the transactions contemplated under this Agreement."

HSI breached Sections 1(a) and 3(a) by not allowing GMD to sell PMT products, and instead appointing and using other agents to sell PMT products in the Territory,[2] in direct competition with GMD, throughout the term of the GMD-HSI Agreement, negating any exclusive agent status of GMD. HSI has breached Sections 1(a) and 3(a) of the GMD-HSI Agreement materially, in two ways: (i) HSI failed to recognize, honor, and enforce GMD's exclusive right to sell PMT products in the Territory, and (ii) HSI engaged other agents, PDC and Wired for Business, to sell those products in the Territory, diverting that right and revenue to a competitor of GMD.

---

[2] Competing agents, and competitors of GMD, are Personally Designed Computer ("**PDC**") and previously Wired for Business.

Chairman Bergman
Page 4
May 22, 2009

HSI never paid GMD any commissions relating to the sale of PMT products in the Territory. GMD repeatedly objected to its failure to receive any commissions under GMD-HSI Agreement for the sale of PMT products in the Territory, and HSI's diverting those sales to competitors of GMD. These objections were lodged with HSI almost from the onset of the term of the GMD-HSI Agreement (*i.e.*, in 2002). HSI never meaningfully responded to those objections or took any action toward them.[3] To date, GMD has not received any commissions from the sale of any PMT products in the Territory.

Sections 1(a), 3(a) and 2.A. have never been amended pursuant to Section 18.

**Breach of Section 2.A. Concerning GMD's Right to Commissions on ProRepair.** HSI has never paid GMD any monies or commissions on ProRepair. ProRepair consists of services, parts and labor HSI provides the dentists to repair small tools and equipment. GMD has requested, pursuant to the terms of the GMD-HSI Agreement, that an accounting and payment be made to GMD for all services provided under ProRepair, but again HSI has refused to do so.

Section 2.A. has never been amended pursuant to Section 18.

I summarize GMD's demands in paragraphs (a) through (c) below:

**(a) Accounting and Cure of Breach of Section 2.A.** HSI must account for sale of dental equipment that GMD has made for HSI in the Territory since June 2002; and then, under Section 2.A, HSI must pay GMD the Contractual Commission rate on all of those sales, within 30 days from the date of this letter.

**(b) Accounting and Cure for Breach of Sections 2.A., and Sections 1(a), and 3(a).** HSI must account for all sales made by Nephron Dental in the Territory from 2002 to date, and then, under Section 2.A., HSI must pay GMD the Contractual Commission rate on all such Nephron Dental sales made in the Territory, such payment to be made within thirty (30) days from the date of this letter.

---

[3] In Dave Stecks discussion on PMT (Dentrix Software) at the 2008 Schein Dental National Sales Meeting said "The most important product we sell is Dentrix". HSI is well aware of the breach in exclusivity of the PMT agent as well the lack of commissions paid on PMT in Hawaii to GMD. In a review of Dave Stecks business trip to Hawaii September 22-24 2003, his action items notes for PMT/Dentrix follow up action steps:

Dentrix/Meeting

Number 1 Need: PMTS Reimbursement to Global (Dave)

While continuing a trend in how HSI deals with GMD, there was much discussion over the years, ending up with a section reserved for PMT payments on every Commission Report for the Hawaii market generated by HSI through Jack McCay. The problem is there has been no payment for PMT sales in Hawaii.

Chairman Bergman
Page 5
May 22, 2009

**(c) Accounting and Cure of Breach of Section 1(a), 3(a) and 2.A.**  HSI must account for all sales of PMT products in the Territory since June 2002; and then, under Section 2.A., HSI must pay GMD the Contractual Commission rate on all such PMT sales, within 30 days from the date of this letter.  HSI must repudiate and cancel its appointment of all competing agents in the Territory, including PDC.

**(d) Accounting and Cure of Breach of Section 2.A.**  HSI must account for all revenue HSI has earned from ProRepair in connection with the Territory since 2002; and then, under Section 2.A., HSI must pay GMD the Contractual Commission rate on the gross profit of those ProRepair service sales, within 30 days from the date of this letter.

We calculate the above-mentioned breaches to be in excess of $600,000 of owing but unpaid commissions to GMD within 30 days.  HSI must make an accounting and explanation to GMD, and its representatives, including producing all records specifically relevant to and explanatory of all HSI revenues earned or received from any and all sales of HSI's products, equipment and services made to customers in the Territory from June 3, 2002 through to the date of this letter, and categorize all such sales by year and product category subsection.  Further HSI must pay to GMD within 30 days from the date of this letter, the unpaid but owing commissions on such sales in the Territory.

Sincerely,

Craig Holbrook, CEO
Holbrook Enterprises, LLC
*dba* Global Medical & Dental


cc:     Michael Ettinger, General Counsel (via fax: 516-843-5675)

# Exhibit E

**HENRY SCHEIN®**

Henry Schein, Inc. • 135 Duryea Road • Melville, NY 11747

GENERAL BUSINESS: 1-631-843-5500
FAX: 1-631-843-5680
www.henryschein.com

June 22, 2009

Craig Holbrook, CEO
Global Medical & Dental
91-291 Kalealoa Blvd. Unit C-1
Kapolei, Hawaii, 96707

Dear Mr. Holbrook:

We are writing in response to your letter dated May 22, 2009. You write in regard to certain alleged breaches of the Sales Agent Agreement dated June 3, 2002 between Henry Schein, Inc. and Holbrook Enterprises, LLC d/b/a Global Medical & Dental (referred to as the "First Amendment") as amended by the Second Amendment dated as of October 26, 2005 (the "Second Amendment"). The First and Second Amendments reflect amendments to the Sales Agent Agreement dated April 1, 1996 (the "Original Agreement") assigned to you by MFH Consultants, Inc. in 2002.

I will address each of the alleged breaches you claim to have occurred between May 2002 – May 2009 (the "Relevant Period"), in the order set forth in your letter.

(a) Dental Equipment Sales; Other Sales

You will note that the First Amendment and Second Amendment reflect the parties' intention to provide for increased commissions on certain eligible products, while giving you the opportunity to purchase equipment directly for resale. On the former products, the commission rate was raised from a blended rate of 10% of Net Sales under the Original Agreement, to first, 31.71% of gross profit under the First Amendment, and later, to 40.00% of gross profit under the Second Amendment. At the same time, equipment sales were carved out of the commission structure, first to provide you with cost-plus ten (10%) percent terms, and then, granting you permission to purchase equipment directly from manufacturers. The purpose for carving equipment out of the commission structure was in recognition of your desire to build an infrastructure to support such sales and permit you to reap the direct benefit of the gross margin on those sales to support additional infrastructure expense. We readily introduced you to our many vendor partners and have eagerly supported your efforts to expand your equipment offering. Accordingly, we believe that amending the Original Agreement and permitting you to source equipment products directly from other sources, relieved us from any obligation to commission you on sales of equipment products. Any commissions paid on such sales are at our discretion.

According to our records Henry Schein made traditional equipment sales totaling $4,058,514 to Global Medical & Dental since May 1, 2002. These have been sold to you at a cost plus arrangement and therefore no commissions are due. In addition, HSI sold $1,398,960 of high technology equipment for which Global Medical & Dental has been

---

*Products & Services for Healthcare Professionals*



ISO 9002 / EN 46002

paid a commission. There was $7,307 of lab equipment that was inadvertently omitted from the commission calculation that would have resulted in additional commission due of $673. The only other equipment sales that have taken place in the Territory are sales of the E4D product. While we would have preferred to sell these products directly through you, as previously stated above, we are under no obligation to do so. The very technical nature of the product requires the expertise of a specialized sales force. Notwithstanding the foregoing, we do acknowledge that Global did provide assistance with these transactions. Accordingly, we are open to discussing a fair compensation arrangement to reflect the contributions of your team, which resulted in a total of $106,793 of gross profit before considering freight costs during the Relevant Period. However, this discussion must reflect the costs incurred directly by Henry Schein in making these sales.

You should note that sales of Camlog product, which we calculate resulted in gross profit of $5,688 during the Relevant Period, are made through our Specialties Group and do not fall within any of the divisions described in Section 1(a) of the Original Agreement. Accordingly, no commission is payable.

Finally, we have determined that Global Medical & Dental did not receive commissions from the sale of certain alloy and porcelain products sold under the Pentron name, as well as certain inadvertently un-commissioned Special Market sales of teeth (note that all other tooth sales have been properly commissioned). We have identified Pentron sales during the Relevant Period of $461,231, resulting in gross profit of $83,399, which would result in commissions due of $32,300. The teeth sales during the Relevant Period accumulated to $28,989, resulting in gross profit of $7,048, which would result in commission due of $2,319.

(b) Sales made by Nephron Dental

Nephron Dental operated as a Henry Schein company from 1996 to 2005. During such time, it was never considered part of HSI's Dental Division as contemplated by the Original Agreement. Accordingly, it is our position that Global Medical & Dental is not eligible for any commission on gross profit from sales made by Nephron Dental in Hawaii.

(c) Sales made by PMT Division

You reference a claim for commissions under Section 2A of the First Amendment based on GMD's right to sell *all* products distributed by PMT's division. Your interpretation of this section is without support. At the time of execution of the Original Agreement, the PMT division sold a mail order software product called Easy Dental, which did not require a specialized sales force to assist in installation, service and training. However, two years after the execution of the Original Agreement, in 1998, Henry Schein purchased Dentrix Dental Systems and began to offer these sophisticated software products, which required a specialized sales force to support sales. In fact, during the six years when MFH served as agent, there was a clear understanding that these types of

products were not HSI Products as defined under the Original Agreement and therefore not treated as commissionable sales. As the assignee of the Original Agreement, you are bound by the parties' interpretation of the Original Agreement and the course of conduct with respect to these products. Notwithstanding the foregoing, it appears that there was an understanding reached between Global Medical & Dental and Henry Schein to compensate you for software sales in the same manner we compensate our Field Sales Consultants. It was our understanding that you were being so compensated, however, a review of our records indicate that during the Relevant Period there is an outstanding amount due of $49,112, based on commissionable gross profit of $545,689 and a commission rate of 9%. This understanding is confirmed by the fact that Global Medical & Dental and Shakail Ahmed, the VAR in the Hawaii territory, have agreed that high-tech equipment sales will be sold through Global Medical & Dental, while all software sales are to be made through Mr. Ahmed's organization.

(d) Sales made by Pro Repair

We have calculated that during the Relevant Period, Pro Repair had sales of $810,901. The commission amount is already reflected in the commission statements and commissions paid to Global Medical & Dental during the Relevant Period.

We have attempted, in good faith, to respond to your request for information concerning past sales of HSI Products and the calculation of commissions due on those sales. Your allegations that Global Medical & Dental is owed more than $600,000 in unpaid commissions is unfounded and without support. While there are certain commissionable sale amounts described above that were inadvertently omitted from the Global Medical & Dental commission calculation, we have determined that this amount totals $35,292, which is being wire transferred to your account concurrent with the delivery of this letter.

Upon confirmation of your understanding of the commission treatment of software products, we will arrange for the delivery of the outstanding payment. Finally, as indicated above, we are open to discussion of a fair resolution on the treatment of D4D sales.

Pursuant to Section 14 of the Original Agreement, you have the right to audit our books and records, at your cost and expense, to confirm the accuracy of the information provided herein.

We welcome the opportunity to meet with you to discuss this issue, as well as discussing how we can make Hawaii a more profitable region for both of us.

Further, we also extend our openness to further exploring an exit strategy for the owners of Global Medical & Dental.

Very truly yours,

Michael S. Ettinger
Senior Vice President &
General Counsel


cc:     Richard Miranda
        Howard Zauberman

# Exhibit F

# GLOBAL MEDICAL & DENTAL
91-291 Kalaeloa Blvd. Unit C-1
Kapolei, Hawaii 96707

June 25, 2009

**VIA FACSIMILE *(631-843-5680)*, CERTIFIED MAIL /**
**RETURN RECEIPT REQUESTED AND U.S. MAIL**

Stanley M. Bergman
Chairman and Chief Executive Officer
Henry Schein, Inc.
135 Duryea Road
Melville, NY 11747

> Re:   Notice of Termination of Agreement for Failure to Cure Multiple
> Breaches of Contract

Dear Chairman Bergman:

I write to notify you that Holbrook Enterprises, LLC *dba* Global Medical & Dental ("**GMD**") hereby terminates the Exclusive Sales Agent Agreement dated June 3, 2002 (as amended) between Henry Schein, Inc. ("**HSI**") and GMD (the "**GMD-HSI Agreement**"), effective immediately (i.e., upon receipt of this letter by HSI).

I detailed HSI's material breaches under the GMD-HSI Agreement in my May 22, 2009 letter (the "**Letter**") to you. In the spirit of good faith, although not required by the GMD-HSI Agreement, the Letter gave HSI **thirty (30)** days within which to *cure* those material breaches. HSI has failed to do so, and, as explained below, HSI has confirmed and aggravated those material breaches. HSI also has not sent GMD the information requested in the Letter on the unpaid commissions HSI owes GMD. Instead of a cure, HSI has sent a letter from its General Counsel, Michael S. Ettinger (the "**HSI Letter**"). I briefly respond below to the HSI letter, which in no way cures HSI's breaches of the GMD-HSI Agreement.

**(a)**   **Dental Equipment Sales.** The HSI Letter asserts that the parties carved out certain equipment sales from the GMD-HSI Agreement, including without limitation GMD's 40% commissions on E4Ds and other equipment. No such language exists in the GMD-HSI Agreement or any of its two amendments. Indeed, the HSI Letter falsely asserts that "[a]ny commissions paid on such sales are at [HSI's] discretion," not a contractual obligation. HSI, as drafter of the GMD-HSI Agreement, knew how to exclude commissions for "dental sales." Section 2A of the First Amendment to the GMD-HSI Agreement, for instance, states "excluding special markets (DSM) sales" for GMD's commission. Neither the GMD-HSI Agreement nor any amendment thereto excludes E4Ds and other equipment from the 40% commission that GMD is owed. The E4Ds and other equipment are not part of any "excluded special market." The GMD-HSI Agreement requires any amendment to be in writing by both parties, as the parties did with the two amendments to the GMD-HSI Agreement.

Chairman Bergman
June 25, 2009
Page 2

Instead of HSI paying GMD the 40% commissions on the sale of E4Ds and other equipment in the Territory, HSI through the HSI Letter chooses to aggravate its material breach: HSI seeks to *hold hostage* commissions that HSI concedes that HSI owes GMD, if GMD will agree to a commission rate lower than GMD is promised under the GMD-HSI Agreement. GMD declines to accept less than what GMD is owed under the GMD-HSI Agreement.

(b)   **Sales by Nephron Dental.** The HSI Letter attempts to justify HSI's breach of the GMD-HSI Agreement on GMD's exclusive right to sell HSI products in Hawaii, by asserting that Nephron Dental was not part of HSI Dental Division. The HSI Letter perfectly misses the point. Under Section 1 of the GMD-HSI Agreement, never amended, GMD has an "*exclusive right* to sell HSI Products in the Territory." (Emphasis added.) It does not matter whether or not Nephron Dental was part of HSI's Dental Division. HSI allowed another entity to usurp GMD's "exclusive right to sell HSI Products in the Territory." Indeed, HSI *facilitated* that usurpation at GMD's expense. Nephron Dental sold "HSI products in the Territory" in direct competition with GMD. "Exclusive" does not mean "shared." That Nephron Dental was *owned* by HSI and under HSI's control only aggravates HSI's material contractual breach by adding a breach of the duty of good faith and fair dealing, if not fraud.

(c)   **Sales by PMT Division.** The HSI Letter attempts to avoid HSI's obligation to pay GMD the commissions on PMT Division products by asserting that GMD's assignor, MFH, somehow had an "understanding" that MFH did not have the exclusive right to sell PMT products, nor receive a commission from the same. Logic and the law negate that specious assertion. GMD, as assignee, is not bound by any purported, unmemorialized understanding to the GMD-HSI Agreement, or any purported waiver of the GMD-HSI Agreement. Any change in GMD's commission rights specified under the GMD-HSI Agreement had to be in writing, signed by both parties. There is no amendment of the GMD-HSI Agreement to change GMD's right to commissions from **all** PMT sales in Hawaii, nor to slash GMD's 40% commission rate to 9% (or any other lower commission rate). (That HSI pays its own salespeople a 9% commission, or that HSI added products to PMT after the GMD-HSI Agreement was signed, is irrelevant to what the GMD-HSI Agreement explicitly specifies in a written contract for GMD's commission rate.)

Since the assignment of the GMD-HSI Agreement to GMD, HSI allowed both Wired For Business and PDC (*i.e.*, Shakil Amed's company) to compete with GMD in the Territory with respect to Henry Schein products. Worse yet, when Wired For Business exited the marketplace in the Territory, HSI choose to replace Wired For Business with PDC, not with GMD, against GMD's strong objections.

In addition, under Section 19 of the GMD-HSI Agreement, also never amended, "[t]he failure of either party at any time to require performance by the other party of any of the provisions hereof shall not affect in any way such party's right to require full performance at any time thereafter, nor shall the waiver by either party of a breach of any provision hereof be taken or held to be a waiver of any subsequent breach of the same or any other provision hereof." Thus, even assuming that MFH chose not to enforce its contractual exclusivity rights, any such waiver on MFH's part of HSI's earlier breach of the exclusivity provision does not affect GMD's

Chairman Bergman
June 25, 2009
Page 3

right to enforce its exclusivity rights under the GMD-HSI Agreement and hold HSI accountable for violating GMD's exclusivity rights.

Instead of HSI paying GMD what GMD is owed for commissions on the sale of PMT products, HSI chooses to aggravate the material breach: HSI holds hostage $49,112 in commissions that GMD admittedly is owed, and that HSI will pay only if GMD will agree to a commission rate much lower than the 40% specified in the GMD-HSI Agreement.

Moreover, if HSI maintains that it had a further undisclosed "understanding" with MFH, and HSI then did not disclose and manifest that "understanding" to GMD at the time of GMD's assuming the assignment, HSI defrauded GMD at the inception of the contractual relationship, if, in fact, the exclusivity rights to PMT Division products were somehow eliminated before the assignment (although, as explained above, they clearly were not eliminated).

    **(d)    Ora Pharma.** The Letter specifically requested sales information concerning Ora Pharma that has been sold extensively in Hawaii, for which GMD has not received any commissions. The HSI Letter completely ignored that request for information on Ora Pharma, and the HSI Letter did not provide any response concerning Ora Pharma.

    **(e)    Camlog.** The HSI Letter asks GMD to note that sales of Camlog products are not sold through Henry Schein Dental Division, but instead through HSI's specialty groups. That assertion does not square with reality: Camlog products are extensively advertised and listed in the Schein Dental Division catalogue. Indeed, Camlog is *featured* in a full-page layout on pages 12 and 428 of the 2009 Henry Schein Dental Division catalogue. Again, the HSI Letter advised no commission is payable on a product line that is overtly sold through the Henry Schein Dental Division and marketed in its catalogue.

    **(f)    Sales by Pro Repair.** The HSI Letter fails to provide any explanation or information on this issue, despite GMD's clear demand for that information from HSI in the Letter. The reason for HSI's evasion on this issue is transparent: GMD's records and HSI commission statements reveal GMD has never been paid commissions on Pro Repair sales.

    **General Comments.** It is a shame that it took years and the Letter for HSI to acknowledge its "inadvertent omissions"; *i.e.*, to concede multiple breaches of contract. HSI's withholding of amounts clearly owed to GMD as leverage for HSI to cut a better deal for itself under the GMD-HSI Agreement does not reflect "good faith," nor does HSI's starving GMD of those amounts to negotiate a better acquisition price for GMD's assets. HSI acknowledges that it had at least two competing agents (*e.g.*, Nephron Dental, Wire For Business, and/or PDC) selling HSI Products in the Territory, in competition with and instead of GMD, where GMD is HSI's "exclusive agent in the Territory" under the GMD-HSI Agreement. That acknowledgement both admits HSI's breach of contract and confirms HSI's bad faith.

Chairman Bergman
June 25, 2009
Page 4

HSI has confirmed, but failed to cure and even aggravated, the several material breaches under the GMD-HSI Agreement. HSI did not meaningfully respond to GMD's request for actual data and information. The HSI Letter basically proposes that the GMD-HSI Agreement be amended unilaterally to suit HSI's desires and thereby retroactively to "cure" HSI's multiple, material breaches. The unreasonable positions espoused in the HSI Letter indicate that HSI will not deal with GMD in good faith to resolve the past issues on the great amounts owed, commission rate, and scope of "Henry HSI Products." GMD therefore cannot expect HSI to act in good faith moving forward.

HSI's history of not paying commissions it owes GMD, inadvertently, deliberately, and/or by diverting business to competing agents, has eroded GMD's financial position over the years, causing GMD to operate in the red and ultimately forcing GMD to fail. GMD has rejected HSI's wiring GMD a token $35,292 amount to settle commissions that are a whole order of magnitude greater under the GMD-HSI Agreement. GMD will not settle a **$600,000+** claim for $35,000, and GMD instead will pursue its meritorious claims against HSI post-termination.

**GMD therefore hereby terminates the GMD-HSI Agreement effective immediately (i.e., upon receipt of this letter by HSI). GMD reserves any and all additional rights and claims against HSI that GMD may have under the GMD-HSI Agreement, at law, in equity, or any or all of them.**

Sincerely,

Craig Holbrook, CEO
Holbrook Enterprises, LLC
*dba* Global Medical & Dental

cc:   Michael Ettinger
      General Counsel (via fax: 631-843-5680)