UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| HENRY SCHEIN, INC., a Delaware corporation,<br><br>                    Plaintiff,<br><br>         v.<br><br>CRAIG HOLBROOK, HOLBROOK ENTERPRISES, LLC d/b/a GLOBAL MEDICAL & DENTAL, a Hawaii limited liability company, and PATTERSON DENTAL SUPPLY, INC., a Minnesota corporation,<br><br>                    Defendants. | 09 CV 2769 (LDW)(AKT) |

# DECLARATION OF DAVID ARTHUR STECK IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

I, DAVID ARTHUR STECK, under penalty of perjury, declare:

1.     I am the Vice President/General Manager of Henry Schein Dental, a division of Henry Schein, Inc. ("Schein"). I have served in this capacity since 2005. Prior to that, I was the Zone General Manager for Schein Dental's Western Zone, which covers the West Coast of the United States and Hawaii. In that role I oversaw Schein Dental's operations in Hawaii. I make this Declaration in support of Schein's Motion for a Temporary Restraining Order, Preliminary Injunction and Expedited Discovery. Except where stated to be on the basis of information located in Schein's records, the following is based upon my personal knowledge.

**Introduction and Summary**

2.     Schein was founded in 1932 as a small storefront pharmacy in Queens. The company has grown over the years to become the largest distributor of healthcare products and services to office-based practitioners in the combined North American and European markets.

Schein serves customers in nearly 200 countries, and employs more than 12,000 people worldwide. Schein is headquartered in Melville, New York.

3. With few exceptions, nearly all of Schein's product distribution is performed using Schein's own employees. One of those few exceptions is in Hawaii. Since 1992, Schein has had an Exclusive Sales Agent in Hawaii which has been highly integrated into Schein's operations. The Exclusive Sales Agent Agreement (the "Agreement" or the "Exclusive Sales Agent Agreement") between Schein and that sales agent contains certain provisions as a consequence of that fact. First, it provides that, if the agreement is terminated, the sales agent will not compete with Schein for a period of one year from the termination. Second, the agreement provides that the "Confidential Information" that the sales agent possesses, including such things as Schein's customer lists, the customers' pricing, their requirements, their order history, their upcoming equipment needs and the equipment purchases they have made, among other things, will not be disclosed to any other person, or used by the sales agent or its employees for any purpose other than to act as Schein's sales agent. These provisions are set forth below in Paragraphs 21, 23 and 24 of this Declaration.

4. Schein has learned that late last week (apparently on Friday, June 26), Schein's current exclusive sales agent in Hawaii, Holbrook Enterprises, LLC, d/b/a Global Medical and Dental ("Global"), sold its business to one of Schein's major competitors, Patterson Dental Supply, Inc. ("Patterson Dental"). Global gave no advance notice to Schein that it was planning to do so. Patterson and Global are now trying to convert Schein's Hawaiian customers to be Patterson customers, in violation of the restrictive covenants and confidentiality provisions of the 1996 Exclusive Sales Agent Agreement that Global took over by assignment in 2002.

2

5. As a result, the business that Schein has built up in Hawaii over many years through Global and its predecessor as sales agent, including the entire sales force of Global employees who sold to Schein accounts and called on Schein's customers, and all of the accumulated knowledge of those sales representatives about Schein's customers and their dealings with Schein, is suddenly claimed to be the property of one of Schein's major competitors. Global closed on Friday as a Schein facility and opened on Monday morning as Patterson Dental.

6. Global has claimed in a letter dated June 25, 2009 (copy annexed as Exhibit D) that it was entitled to terminate the Agreement because Schein has materially breached it by failing to pay certain commissions claimed to be due. I explain below: (a) the reasons Schein believes that most of Global's claims to extra commissions lack merit; (b) that Schein tried to pay on some of Global's claims, but that Global has refused to accept the payment (because Global's plan was to terminate the Agreement based on these claimed material breaches so that it could try to avoid the restrictive covenants and confidentiality provisions of the Agreement); and (c) that Schein offered to discuss and to compromise other of Global's claims that involved new, technical products not contemplated by the parties' agreement. I also explain why, in any case, the claimed defaults by Schein, even if they were meritorious (which they are not), would not be material in the context of the parties' relationship and business as a whole.

7. At bottom, Global's actions can be seen for what they are: a pretext to avoid the restrictive covenant and other protections Schein has in the Agreement and to take over Schein's Hawaiian business. Under certain circumstances, Global could pay a "Breakup Fee" equal to the last twelve months' commissions and be free of the one-year non-compete in the Sales

Agreement. Global has not paid that fee, however (the fee would be approximately $1.2 million), and the non-compete applies.

8.    In addition, this Declaration explains the history of Schein's relationship and business with Global and why Schein will be irreparably harmed if Global is permitted to transfer Schein's customers, Schein's confidential information, and all of the goodwill that Schein has built up in Hawaii to Schein's competitor Patterson Dental, in violation of the restrictive covenants in the Sales Agreement.

**Schein's Business In Hawaii**

9.    During the 1990's, Schein had a strategy to grow into a full-service distributor nationwide, by acquiring or by partnering with full-service distributors in all major markets. Before 1996, Schein served the Hawaii market through mail order and catalog sales from the Western Zone of the continental United States. In 1996, Schein looked to increase its presence in the Hawaiian market by entering into the Exclusive Sales Agent Agreement with Mark F. Heilborn d/b/a M.F.H. Consultants, Inc. ("MFH"). A copy of the Exclusive Sales Agent Agreement ("Exclusive Sales Agent Agreement") is Exhibit A to the Complaint in this case.

10.    In 2002, Craig Holbrook approached Schein about acquiring MFH's business. Craig has informed me that he had no prior experience in the dental field, and no prior connections to Hawaii, before this purchase. He was a medical sales representative from Texas. Craig's father Ken Holbrook was a successful businessman who was willing to partner with his son in the purchase of a dental supply company. Schein was willing to allow Holbrook to purchase MFH, and to act as Schein's exclusive sales agent in Hawaii, despite Craig's lack of experience in the dental business, because Schein had been experiencing complaints about MFH's owner.

11. The Holbrooks formed Global Medical & Dental ("Global"), and in an Amendment to the 1996 Sales Agreement, Schein agreed to the assignment of the exclusive sales agency and the Exclusive Sales Agent Agreement from MFH to Global (see Exhibit B to Complaint, first and second Whereas Clauses).

**Global's Business Has Grown, Using The Confidential Information
That Schein Has Given To It As Its Exclusive Sales Agent For Hawaii**

12. Beginning in 2002, and carrying straight through to the present, Schein helped Global in many ways to build its business and, in the process, to help build Schein's business in Hawaii. Global's sales of Schein dental products grew from approximately $7.3 million in 2003 to over $10 million in 2008.

13. The commission rate on dental products under the 1996 Agreement was 10% of net sales. When Schein agreed to allow Global to take over the business in 2002, Schein also agreed to raise that commission rate to 31.71% of gross profits (Exhibit B to Complaint, Paragraph 2.A).

14. The original agreement was intended to address principally merchandise sales, which are the kind of "consumable" dental products that dentists use regularly in their practices, such as gloves, gauze, etc. By 2002, Schein was more heavily involved in the equipment sales business than it had been previously. The 2002 agreement with Global expanded the sales agency to include the purchase of dental equipment from Schein at Schein's cost from the equipment's manufacturer plus 10%, so that Global could move more into the dental equipment business, just as Schein itself was doing. This dental equipment included items such as dental chairs, digital x-ray machines and scanners.

15. In 2005, at Global's request, Schein agreed both to raise the commission rate on the consumable dental products to 40% and to allow Global to purchase dental equipment

5

directly from the manufacturers, so that Global could keep all of the sales margin on those higher end products.

16. Since Global assumed the Exclusive Sales Agent Agreement in 2002, Schein's records show that Global's commissions have increased from approximately $750,000 in 2003 (the first full year of Global's agency) to over $1.2 million in 2008. Schein has paid Global more than $7.2 million in commissions since 2002.

17. At present, Hawaii is the only major market in the United States that Schein still services using an independent, full-service sales agent. As a result, Global was in many respects treated similarly to a Schein-owned company. Global's sales force (which generally consisted of approximately five sales representatives at any given time) was treated similarly to sales representatives employed directly by Schein in other locations.

18. Thus, for example, Schein helped build Global's business by, among other things:

- Providing Global's sales representatives with confidential training materials in sales techniques, which teaches them the skills needed to distinguish themselves from their competitors and to become consultants to a dental practice, rather than simply order takers.

- Providing access to our practice analysis tool, proprietary Schein software that enables a sales representative to demonstrate to a customer where they might maximize their business and how the products that Schein sold could assist them in doing so.

- Sharing our business model and financial information with Global's sales representatives.

- Inviting Global's sales force to Schein's career development classes taught in Wisconsin.

- Inviting Global's sales force to Schein's national sales meetings annually. These are a combination of vendor fair, at which vendors introduce new products, and educational events at which different aspects of the business of dentistry are discussed. At the sales meetings, participants are given exclusive product information, listen to key note speeches from prominent individuals in the industry, learn Schein's company strategy and competitive plans, including discussions of Schein's pricing. This event costs over $2 million to produce each year, and Schein paid for Global's sales force to attend.

19. In numerous ways, Global's sales force was integrated into Schein's business. For example, Schein furnished laptop computers to all of Global's sales representatives so they could communicate with Schein's sales management systems. Global has a computer system that is linked directly to Schein's computer servers, so that orders that came in to Schein over the internet, or to one of Schein's national call centers, would be routed directly through to Global's warehouse. All of Global's merchandise sales were invoiced directly by Schein, on Schein invoices. Global's business cards carried the Schein name, in addition to Global's logo. (A copy is annexed as Exhibit A.) All of Schein's inventory in Hawaii (over $1.5 million worth at present) was stored in Global's warehouse.

20. Over the past seven years, Global has acquired substantial confidential information about Schein's customers in Hawaii, including their identities, their contact information and office staff information, their ordering patterns, their pricing structure (not all pricing is uniform in the dental supply business), their upcoming needs (for example, which

offices might be due to buy a new digital x-ray machine), their requirements and preferences for supplies and merchandise.  Having that information gives Schein (and Global) a competitive advantage.

**Schein's Confidential Information Is Protected**
**Under The Exclusive Sales Agent Agreement**

21. The Exclusive Sales Agent Agreement defines Schein's "Confidential Information" as follows:

> [Global], on his or its own behalf and on behalf of any and all of his or its employees, hereby agrees, *at any time* not to divulge, use, derive monetary or economic benefit from or make accessible to any person or business entity any of *[Schein's] trade secrets and/or confidential or proprietary information including, but not limited to, the identity or lists of customers, customer's needs and requirements, business methods, operational procedures, cost and price information, organizational and/or other business or financial information, or any other information for or incidental to the manufacture, marketing, or promotion of Products or the business structure or related elements or areas of [Schein's] organization . . . (all such information or any part thereof, the "Confidential Information")* without the prior written consent of [Schein] . . . .

1996 Agreement (Exhibit A to Complaint) at ¶11 on page 8; emphases added.  There is no time limit on this prohibition against Global using or divulging Schein's Confidential Information.

22. Global's sales force has had access to all of that Confidential Information and more.

**The Restrictive Covenants In The Exclusive Sales Agent Agreement**

23. The Exclusive Sales Agent Agreement provides a further mechanism to protect Schein from competition by its exclusive sales agency.  The Agreement provides in Section 12 (on pages 8-9), entitled "Restrictive Covenants," that during its term—which runs until December 31, 2015 (see Exhibit B to Complaint, Paragraph 1(A):

8

> Agent covenants and agrees that Agent will not, at any time during any term hereof, directly or indirectly, within the Territory or within any other geographical area or territory where the business of [Schein] is presently being conducted . . own, manage, operate or control, or participate in the ownership, management, operation or control of, or be connected with or have any interest in, as an employee, consultant, advisor, agent, owner, partner, co-venturer, principal, director, stockholder, lender or otherwise, any business or enterprise that is competitive with any significant part of the business conducted by [Schein] . . .

**Exclusive Sales Agent Agreement ¶12(a).**

24.  Section 13 (a) (ii) of the Exclusive Sales Agent Agreement provides that "Agent's voluntary termination of this Agreement will result in the imposition of the restrictive covenant set forth in paragraph 12(a) above for a period of not less than one year from the date of such…voluntary termination."  This one-year non-compete period gives Schein the opportunity to retain its customers and to deploy its own sales force to service them, while at the same time further protecting the "Confidential Information" that Global had received from Schein.

25.  If the Exclusive Sales Agent Agreement is not enforced and Schein is not given the benefit of the one-year non-compete in the Exclusive Sales Agent Agreement, Global will be well, and unfairly, positioned to capture as its own Schein's customers before Schein can effectively compete with it for the business of those customers.  The former Global sales representatives will have the advantage not only of the relationships that they have built as Schein's exclusive agent, and using the techniques that Schein has trained them in, but of the detailed knowledge of the "Confidential Information" they acquired as Schein sales representatives.  Schein's business in Hawaii would, at a minimum, be seriously damaged, possibly for years to come.

**Global's Unsuccessful Effort To Sell Its Business To Schein And**
**Its Recent Plan To Take Over Schein's Hawaiian Business and**
**<u>To Sell It To One Of Schein's Major Competitor, Patterson Dental</u>**

26. In late 2008, I was informed by Russ Baker, Schein's Western Zone Manager, that Holbrook had expressed an interest in selling Global to Schein. I called Holbrook, and he expressed a willingness to meet with Schein's Business Development team in New York, which handles such transactions. Holbrook never indicated to me at that time that he was in financial distress, or that he had to sell the business. I told Holbrook that leaving the current arrangement in place was acceptable to Schein, but that Schein would be happy to discuss the purchase of his business if Holbrook wanted to sell it. The Business Development team had discussions with Holbrook that lasted until early 2009, but Schein was unable to agree to Holbrook's demands.

27. After those discussions terminated, Schein received a letter from Holbrook dated May 22, 2009, asserting that Schein had underpaid it on commissions due under the Agreement. A copy is annexed as Exhibit B. The letter gave no indication that Holbrook was intending to sell Global's Schein business to one of Schein's major competitors. I now understand that Global's plan was to try to avoid the contractual protections afforded Schein under the Exclusive Sales Agent Agreement by claiming that Schein had materially breached that Agreement and by purporting to terminate it for cause on that trumped-up basis.

28. In its May 22 letter, Global made essentially four claims for extra commissions. Global demanded payment of an amount it fancifully estimated at $600,000 but gave no indication that it was planning to declare the long term Agreement terminated if its entire claim was not paid in full within 30 days. I will address each of Global's claims for more commissions in turn.

**Claim Number One – Equipment Commissions**

29. Global claims that Schein owes it commissions on equipment sales. The principal claim here concerns the E4D, a scanning/milling machine that enables a dentist to take electronic

10

impressions and to make crowns in his or her office, rather than sending them out to a dental laboratory.

30. Some background on how equipment sales have been treated in the Agreement over the years is necessary to understand this issue. When the Agreement was first executed in 1996, equipment sales were not a very large component of Schein's business. Therefore the 1996 Agreement did not directly address equipment sales.

31. By 2002, when Holbrook took over the Agreement from MFH, Schein was becoming more of a full-service distributor, and was selling more equipment than it had in previous years. Holbrook wanted Global to sell more equipment than MFH had, but Holbrook asked for a different arrangement on equipment sales than he had for other dental products. Holbrook wanted Global to be able to purchase the equipment directly from Schein (Holbrook did not purchase dental products from Schein; it simply acted as Schein's sales agent, as the title of the Agreement suggests), at Schein's cost plus a 10% markup.

32. Global would then resell the equipment and keep whatever profit Global was able to make on that sale. (2002 Amendment (Complaint, Exhibit B) at ¶6.) There were therefore no commissions to be paid to Global on these arrangements. Global received all of the profit on the resale and Schein received the 10% markup from Global. Global did its own invoicing to the customer on these equipment sales, they were not invoiced through Schein as was the case for the dental products it sold through Global's agency.

33. In 2005, Holbrook asked for a new arrangement. He wanted his commission rate on the Schein dental products, expressed as a percentage of gross profit, to increase from 31.71%, as reflected in the 2002 Amendment, to 40%. He also asked for Schein's assistance in

11

purchasing equipment directly from equipment manufacturers, without having to pay Schein the 10% mark-up. Schein agreed. (2005 Amendment (Complaint Exhibit C.))

34. Over the years, as Schein's business grew and Schein became more established as a full-service dealer, Schein entered into several exclusive distribution agreements with equipment manufacturers. In such arrangements, Schein typically had to invest in the creation of a specialized sales force to sell these complex products, and to compensate those sales representatives for their efforts. Typically, in such cases, the "specialty rep" would get a commission, the "Field Service Consultant" (the customer's usual Schein representative) would get a commission, and the "Equipment Sales Specialist," who would install and service the equipment, would get a third commission. The commission for the Field Service Consultant in such cases would be smaller than their usual commission on product sales, because of the need to pay the other two commissions.

35. There was another line of products, called Instrumentarium, that Schein sold in this manner on which Global was paid a commission. In that case, Schein paid Global the same commission percentage that Schein's Field Service Consultants were being paid. The same arrangement was later implemented with respect to a software product called Dentrix, another Schein exclusive product that Schein sold through a specialized sales force.

36. In 2008, Schein introduced the E4D. I had a discussion with Holbrook about the commission arrangements on sales of such equipment. I told him that I believed that the total commission split among the specialty rep, the Field Service Consultant and the Equipment Sales Specialist would be in the neighborhood of 30%, split among the three. In his letter of May 22, Holbrook claims that I told him that Global would be receiving a 30% commission on such sales.

12

Either deliberately or otherwise, Holbrook's May 22 letter reflects a misunderstanding of what I had said.

37. Later on in 2008, as the May 22 letter reflects, the product manager for the E4D had a discussion with Holbrook concerning the commission split on this equipment. Consistently with our other arrangements, Schein proposed to pay Global the Field Service Consultant's portion of the commission, or 15%. As Holbrook's May 22 letter reflects, no agreement was reached on the commission split to Global on sales of the E4D. But when Schein responded to Holbrook's May 22 letter by its own letter dated June 22, Schein expressed a willingness to continue the discussions. A copy of Schein's June 22 letter is annexed as Exhibit C.

38. Holbrook did not take Schein up on its offer to continue discussions about commissions on the E4D. Instead, Holbrook responded by claiming that Global was terminating the Agreement for material breach. A copy of Holbrook's letter of June 25 is annexed as Exhibit D. As we now can surmise, Holbrook had by that point in time agreed to sell Global's business to Patterson Dental. Holbrook was not looking for a discussion of an open issue between two parties in a long-term business relationship that arose from a new circumstance. Instead, Holbrook wanted a pretext to claim that Global could terminate the Exclusive Sales Agent Agreement for material breach and thus be free to sell Schein's Hawaiian business to Patterson.

## Other Equipment Items

39. In his letter of May 22, Holbrook also raises three other items on which he was not paid commissions – Ora Pharma, Camlog and Pentron Alloy. See Exhibit B at 3. Schein's records do not show any sales of Ora Pharma (an injectible oral antibiotic) in Hawaii. Thus, no

commission would be due on that product. As far as I am aware, Holbrook had not previously claimed that he was owed any commissions for Ora Pharma sales.

40. In response to Holbrook's May 22 letter, Schein examined its records and determined that an error had been made in failing to pay commissions on Pentron Alloy. Accordingly, with its June 22 response, Schein also sent a wire transfer to Global in the amount of approximately $34,000 to cover those commissions. See Exhibit C. I am advised that the records of Schein's finance department show that Global returned this wire transfer to Schein. Global rejected Schein's cure of this default. Apparently Global wanted the claimed breach more than it wanted the money that it had claimed was due.

41. As for Camlog sales, as stated in Schein's June 25 response, that product is sold through Schein's Specialty Division, not the Dental Division. It is therefore outside the scope of the commission arrangement in the Agreement, which, by its terms:

> [is] specifically limited to the products and services manufactured, produced and distributed by [Schein's] Dental Division, [Schein's] Practice Management Technologies Division ("PMT") and [Schein's] dental laboratory subsidiary, Zahn Dental Co., Inc. None of the products and services of [Schein's] other divisions, subsidiaries and or affiliates are involved in the transactions contemplated under this Agreement.

1996 Agreement (Exhibit A to Complaint) at ¶1(a).

42. As discussed in Schein's letter of June 22, there was a total of $5,688 in gross profit from Camlog sales between 2002 and 2009. Even if Global were correct that it is due a 40% commission on that sum, it would amount to $2,275 over that seven-year period.

**Claim Number Two – Nephron Dental**

43. Global also claims that another Schein subsidiary, Nephron Dental, sells dental supplies in Hawaii and that Global is owed a commission on such sales. Furthermore, Global claims that it is a breach of the Agreement to permit Nephron to make such sales. (Exhibit B at

14

3.) In its termination letter, Global claims that the fact that Nephron Dental was owned by Schein "only aggravates" this "material breach." (Exhibit D at 2, 4.)

44. Nephron Dental was dissolved in 2005. The company no longer exists and has not existed for four years.

45. Nephron Dental was never a part of the "Dental Division" of Schein. As such, it is Schein's position that the company's sales were not within the scope of the Agreement. See ¶ 41, above. As far as I am aware, Nephron Dental sold a limited number of products in Hawaii, principally at a particular trade show, on a "cash and carry" basis. I do not believe that these sales resulted in a significant amount of "gross profit," even if they had been within the scope of the Exclusive Sales Agent Agreement.

**Claim Number Three – Software Products**

46. This claim concerns a sophisticated software product called Dentrix. This product is sold through a dedicated sales force. Since 1998, Schein has had a sales representative in Hawaii that is not affiliated with Global that specializes in sophisticated software products. Schein's term for such representatives is "Value Added Representative," or VAR.

47. From the inception of the Dentrix relationship, including for a period of four years before the Agreement was assigned to Global, and for a period of seven years afterwards, Schein has not paid commissions to Global under the Agreement on Dentrix because it was a new product sold through a separate sales force employed by the VAR.

48. Schein believed that Global understood that this was the reason no commissions were due or being paid under the Agreement on that product. In addition, at one point in time, there was a dispute between the VAR in Hawaii, who sold Dentrix, and Global as to who would sell a particular item of high tech equipment. I believed that the two sales representatives had

15

resolved their dispute by agreeing that Global would sell the high tech equipment and the VAR would continue to sell Dentrix. This resolution confirmed Schein's understanding that Global knew that it was not due any commissions on sales of Dentrix.

49.     Although Schein had sold the Dentrix software through its VAR in Hawaii for four years before Global assumed the Exclusive Sales Agreement, with no payment of commissions to Global's predecessor, after Global assumed the Agreement, Holbrook did question why Global was not receiving such commissions. In order to resolve this issue, Schein agreed that it would pay a commission on Dentrix to Global, equal to what Schein paid to its own Field Service Consultants on products where Schein had an exclusive arrangement and a dedicated sales force for a particular product (the same arrangement that Schein had proposed on E4D sales). That Field Service Consultant's commission split was 9% of gross profit. In Schein's letter of June 22, Schein acknowledged this understanding, and that Schein had not paid this commission. Schein offered to pay Global the $49,112 that would be due under this arrangement. All that Schein asked was that Global confirm that this understanding had been reached. See Exhibit C at 3. Global declined the $49,112, just as it declined the $34,000 Schein tendered with its June 22 letter. See Exhibit D at 2-3.

**Claim Number Four – Pro Repair**

50.     The final claim of default in Holbrook's May 22 letter was that Schein had never paid any of the commissions due on Pro Repair. (See Exhibit B at 4.) In its response, Schein pointed out that Pro Repair sales were reflected in the commission statements that Schein had sent to Global, and that Schein had paid commissions on those sales. (See Exhibit C at 3.)

16

51.     Schein also noted that Global had the right under paragraph 14 of the Sales Agreement to audit Schein's books and records, at Global's expense, if Global wished to confirm the accuracy of any of the information provided.  (See Exhibit C at 3.)

52.     In its June 25 termination notice, left with little to say, Global simply characterized this response an "evasion," but did not take Schein up on its invitation to confirm that the commissions had been paid, as the commission statements reflect.  (See Exhibit D at 3.)

**Global's Claims Of Breach In Context**

53.     The Exclusive Sales Agent Agreement encompasses thousands of products that Schein sells.  Global's claims of breach by Schein relate to a total of seven products.  Of those seven products, all the commissions due were paid on two (Pro Repair and Ora Pharma).

54.     Schein cured the claimed default as to two others either by tendering cash (Pentron Alloy) or by offering to pay the amount that was due upon Global's acknowledgement that this was the correct amount (Dentrix).  Both cures were refused.  In one of those cases, a $34,000 wire transfer was returned.

55.     The parties were in discussions over how much would be due on sales of another product (E4D) and Schein had invited Global to continue those discussions.

56.     As to the remaining two (Nephron and Camlog), Schein took the position in good faith that they were not part of the Dental Division, as they had to be to fall within the scope of the Agreement.  In any event, Nephron has been shut down for four years and the sales of Camlog in Hawaii were such that even if Schein were wrong, the amount at stake would be approximately $2,275 over a seven year period, or roughly $325 per year.

57.     The claim for additional commissions with respect to seven products raised in Global's May 22 letter obscures the fact that with respect to the rest of those thousands of

17

products, not even Global, which was apparently highly motivated to find claims of default, could do so.

**Global's And Patterson's Violation Of The Confidentiality And Restrictive Covenants In The Exclusive Sales Agent Agreement**

58. On Monday of this week, Patterson Dental revealed to Schein that it has (presumably on Friday of last week) signed employment agreements with all of Global's sales representatives. A copy of a letter from the General Counsel of Patterson to the General Counsel of Schein, dated June 29, 2009, is annexed as Exhibit E. In effect, the entire Global sales operation, and all of the accumulated knowledge of Schein's "Confidential Information" that Global and its sales force have acquired, has been sold by Global to Patterson Dental. The Exclusive Sales Agent Agreement makes plain that this asset was not Global's to sell. Global agreed in paragraph 11 "not to divulge, use, derive monetary or economic benefit from or make accessible to any person or business entity any of [Schein's] trade secrets and/or confidential or proprietary information."

59. On June 28, 2009, Schein sent a letter to Global, demanding that Global confirm that it was not going to violate the non-compete and confidentiality restrictions in the Sales Agreement. A copy is annexed as Exhibit F. We also asked that Global provide Schein with information on all pending and unfilled customer orders. To my knowledge, Global has never responded to these demands.

---

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 30, 2009.

*David Arthur Steck*
David Arthur Steck